[Crim. No. 407. Third Appellate District.—September 17, 1917.]

## THE PEOPLE, Respondent, v. JOHN F. DUFUR, Appellant.

CRIMINAL LAW—IMPANELING JURY — PEREMPTORY CHALLENGE—PANEL NOT FILLED.—In a criminal action, it is not error to refuse to fill the panel after a juror was excused and to require the defendant to exercise a peremptory challenge when the panel was not full, or to refuse to fill the panel after a physically disqualified person had been excused.

ID. — FRAUDULENT CLAIM ON INSURANCE POLICY — EVIDENCE — DEMAND FOR PRODUCTION OF POLICY—CONSTITUTIONAL RIGHT OF DEFENDANT NOT VIOLATED.—In a prosecution for making a false affidavit and proof of loss with intent to use it in support of a fraudulent claim on an insurance policy, the constitutional right of the defendant not to be called as a witness against himself was not violated by calling upon him to produce the policy, where a copy of the policy retained by the company was introduced in evidence.

ID.—EVIDENCE OF LOSS—MEASURE OF INDEMNITY—CODE PROVISION IN-APPLICABLE.—Section 2756 of the Civil Code fixing the measure of indemnity between insured and insurer in case of burning of insured property as the expense it would be to the insured to replace the thing lost has no application to a prosecution under section 549 of the Penal Code, and, therefore, the proof is not required to be addressed to the measure of indemnity to the insurer.

ID.—PRESENTATION OF CLAIM—PROOF UNNECESSARY.—In a prosecution for the second crime mentioned in section 549 of the Penal Code, the preparing, making, or subscribing of an affidavit or proof of loss with intent to present it in support of a fraudulent claim on a policy of insurance, evidence of the presentation of the claim is admissible, but such crime may be established without such evidence.

Id.—Instruction as to Uncontroverted Facts—Prejudicial Error.— In view of section 19 of article VI of the Constitution, declaring that judges shall not charge juries with respect to matters of fact, but may state the testimony and declare the law, an instruction advising the jury as to certain facts, of which there was evidence there was no contention, and that they should find accordingly, is prejudicial error, as the plea of not guilty put in issue every material fact.

APPEAL from a judgment of the Superior Court of Humboldt County, and from an order denying a new trial. Denver Sevier, Judge.

The facts are stated in the opinion of the court.

L. M. Burnell, and J. L. Kennedy, for Appellant.

U. S. Webb, Attorney-General, and J. Charles Jones, Deputy Attorney-General, for Respondent.

CHIPMAN, P. J.—Defendant was tried upon an information brought under section 549 of the Penal Code charging that he made and subscribed an affidavit and proof of loss with intent to present and use the same and to allow and cause the same to be presented in support of a false and fraudulent claim for loss by fire. The claim is alleged to have been false and fraudulent by reason of the fact that, whereas the claim was alleged to have been made for $250 on a policy of insurance upon household furniture and personal effects, such personal property was charged to be of the value of not to exceed $25. There was a second count based upon a claim arising out of another policy, but as the jury found the defendant not guilty as to this count, it needs no further mention.

The jury found defendant guilty as charged in the first count. He appeals from the judgment of conviction and from the order denying his motion for a new trial. As the judgment and order must be reversed, we will notice some alleged errors as to matters likely to arise again should there be a new trial.

1. It is contended that the court erred to defendant's prejudice in refusing to fill the panel after a juror was excused and requiring defendant to exercise a peremptory challenge

when the panel was not full, and also in refusing to fill the panel after a physically disqualified person had been excused.

This question was raised in *People* v. *Scoggins,* 37 Cal. 676, and decided adversely to defendant's contention. The method of impaneling a jury in a criminal case was established in that case and was approved subsequently in *People* v. *Russell,* 46 Cal. 121; *People* v. *Iams,* 57 Cal. 115; *People* v. *Riley,* 65 Cal. 107, [3 Pac. 413] ; *People* v. *Hickman,* 113 Cal. 81, [45 Pac. 175] ; *People* v. *Harrison,* 18 Cal. App. 288, [123 Pac. 200]. We see no reason for reopening the question, but must regard it as settled.

2. Witness Ridling, an adjuster of fire losses for the company issuing the 'insurance policy in question, was called as a witness for the prosecution. He testified that he met the defendant in Eureka and talked with him about the loss, at which time the defendant told witness that the premises had been burned. "Q. Did Mr. Dufur have the policies of insurance there at that time? A. Yes, sir. Q. Did you examine them? A. Yes, sir. Q. Did he surrender them to you or did he retain them? A. He retained them but let me look them over. Q. You looked them over? A. Yes, sir. Mr. Nelson: Now I will ask the defendant to produce the policies. Mr. Burnell: To that we object and assign it as error upon the part of the District Attorney. He has no right to make any demand of that kind in any way, shape, or form. He cannot call upon the defendant in any way, shape, or form to produce anything. I assign that as error and ask that the jury be instructed to disregard it. Mr. Nelson: If you refuse to do that, we will offer in evidence these copies. Mr. Burnell: We also object to that remark of counsel and ask that counsel be instructed not to make any more such remarks. Mr. Nelson: I ask for the original documents. We are not asking Mr. Dufur to testify. I know he does not have to testify, but we want to identify these documents. Mr. Burnell: My objection runs to all the remarks of the District Attorney. Court: Proceed, Mr. Nelson. Mr. Nelson: Q. I will ask you, Mr. Ridling, to examine that copy of a policy. A. This is a copy of the policy. Mr. Burnell: To that we object, unless he shows he knows this to be a copy of his own knowledge, that he knows this is a copy. Unless he swear of his own knowledge this is a copy. Mr. Nelson· Q. Is this a copy of one of the policies shown you by Mr. Dufur on October 2,

1916, in this city? A. Yes, sir." The copy produced by the witness was then introduced in evidence.

It is urged with much earnestness that this was a violation of defendant's constitutional right forbidding his being called upon to be a witness against himself. 14 Encyclopedia of Evidence, sections 646, 647, is cited to the effect that it is error "even to call upon a defendant in a criminal case in the presence of a jury to testify or produce documents against his will, even though he makes no objection thereto." The following cases are cited in support of this view of the law: *State* v. *Merkley,* 74 Iowa, 695, [39 N. W. 111]; *McKnight* v. *United States,* 115 Fed. 972, [54 C. C. A. 358]; *Gillespie* v. *State,* 5 Okl. Cr. 546, [Ann. Cas. 1912D, 259, 35 L. R. A. (N. S.) 1173, 115 Pac. 620]. In the Oklahoma case it was said: "When such a demand is made, a defendant must accept the alternative of either producing the letters, and thereby incriminate himself, or of having the jury place the strongest possible construction against him upon his failure to do so. If this can be done, the very life, body, and soul of the Constitution would be violated and trampled upon."

In the Iowa case "the defendants answered that they did not have the papers, and did not know where they were," and the court, while holding that the lower court erred in making the inquiry, stated that "whether in view of the answer to the inquiry and the whole record, the defendants were in any respect prejudiced by what the court did we have no occasion to determine."

In view of our constitutional provision found in section 4½, article VI, we must determine this very question whether the error was prejudicial. The policy of insurance was an essential link in the chain of evidence necessary to be proven, although the charge was based upon a false affidavit as to the value of the goods covered by the policy and lost by fire. But the existence of the policy was shown. Defendant had it and showed it to the agent, the witness, to examine and the agent had at the time in his possession the copy of the policy retained by the company, which was introduced.

In the cases cited the documents demanded were the original and only ones in existence. The courts held that secondary evidence of their contents could have been shown, and hence there was no necessity for making the demand in the presence of the jury, thus giving rise to inferences prejudicial

to the defendant. We cannot see how, in the present case, any inference unfavorable or prejudicial to defendant could have arisen in the minds of the jury in view of the fact that the policy in his possession and the one introduced were identically the same and that the offense charged was based upon an entirely different document.

3. Error is assigned in connection with evidence admitted over objection in making proof of value of the property destroyed. Witnesses Jones and his wife testified to the purchase price of certain of the destroyed articles. Certain other witnesses testified to the value of the articles destroyed and, it is contended, that they did not qualify as expert witnesses; that they did not know the market value in the vicinity where the property was situated when destroyed or that there was any market value at that place; and did not know what it would cost to replace the property at the point where destroyed. The contention seems to be that section 2756 of the Civil Code applies, and that the proof should have been addressed to the measure of indemnity to the insurance company which the code says "is the expense it would be to the insured at the time of the commencement of the fire to replace the thing lost or injured in the condition in which it was at the time of the injury." We do not think this section has any application in this case. As between the company and the insured, the section fixes the "measure of indemnity" and that is its sole purpose. The issue here is whether defendant violated section 549 of the Penal Code, which provides that "every person who presents or causes to be presented any false or fraudulent claim, or any proof in support of any such claim, upon any contract of insurance for the payment of any loss, or who prepares, makes, or subscribes any account, certificate of survey, affidavit or proof of loss, or other book, paper, or writing with intent to present or use the same, or to allow it to be presented or used in support of any such claim, is punishable," etc. Rightly to test the correctness of the court's rulings and whether or not prejudicial, the situation and character of the property destroyed should be understood. In 1906 Isham R. Jones acquired the land. It is situated east of Eurcka, about forty-five miles in what is spoken of as "the mountains" or "in the hills." Jones erected a dwelling-house and barn on the premises and moved his family there in 1907. The dwelling con-

sisted of a small sitting or family room and a kitchen: over these was an attic. He took with him for the kitchen a small four-hole cooking-stove and for the family room a small sheet-iron heater, "a pair of bedsprings," which he utilized by nailing them to uprights for legs, "a kind of a camp-chair that had a cloth back and seat and some other chairs." These articles were "second hand" and were purchased in Eureka at a cost, as Jones testified, of $15. He took some bedding, dishes, knives, and forks, and other kitchen utensils. A center table for the family room was roughly constructed after the family arrived. A rough cupboard and table were made for use in the kitchen. In 1914, Jones sold the premises to Ed Baxter and A. D. Dufur, defendant's brother, for whom defendant was attorney in fact and made the affidavit charged in the information. Baxter had a third interest in the premises and sold this interest to Dufur in 1915. He "lived there until the summer or fall of 1915" and had charge of the property. He testified that when he left the place the articles turned over with it by Jones were in the house and that these constituted substantially all of its furnishings. He described the household effects. The heating stove in the family room "was a little, round sheet-iron heating stove, with a kind of fancy top to it, but it had been broken and we had to put the wood in from the top. It was second-handed." He describes the bed thus: "It was made out of poles and I believe a pine board was split out for the front part of it and shaved a little bit in the center, and, if I remember right, the back was the same kind of a board and underneath were legs. All of the bed except the wire springs was a home-made affair. It had been there a long time." Of the bedding he testified: "Well, there was a tick made out of calico. I believe that was spliced together in two or three pieces and I believe it was filled with straw or hay, . . . a half a white blanket that had been a good blanket and a double gray blanket and a quilt stuffed with some kind of feathers, quite a heavy quilt but it had been used a great deal . . . that Mrs. Jones made herself; a pillow or two, but no sheets." He mentions a center table and a small table made out of a drygoods box, "with four small legs attached to it"; also a small diamond-shaped hat-rack with "four pegs in it"; a set of deer horns; a canvas-bottomed "tipping chair," and five or six common wooden-bottom chairs in the whole

building. In addition to the bed described, there was a bunk, home made. "Mr. Wells was sleeping in that and he fixed it up himself." There was no bedding for this bunk. Wells was a hired man. Baxter described the kitchen equipment as consisting of some plates, knives, and forks, and spoons, and some pots and kettles and other small articles, enough to serve a half a dozen people, all old and formerly in use by the Joneses. There was a cupboard built against the wall with three or four shelves "and a cloth nailed up for a cover," and another similarly constructed cupboard with no cover; a home-made sink of wood; the cooking-stove he describes as "a small stove, a four-hole cooking-stove," old when he went there; "the fire-box was burned out and Mr. Wells had patched it up"; the chairs were old as were all the cooking utensils; there were two galvanized washtubs, one in fairly good condition, the "other leaked and would not hold water." The foregoing covers substantially the furnishings of the dwelling. This and other witnesses mentioned some other things of small value. The witness was asked to state "the value of the household contents" when he was last there, and replied: "About twenty-five or thirty dollars." "Q. You would consider that a liberal valuation? A. Yes, sir." Several witnesses were called to testify to the contents of the house—persons who lived in the vicinity and had frequently been at the Dufur house, some of them working there, eating and sleeping at the place. They described the furnishings and the condition they were in as to use. None of them fixed a greater value than did Baxter and some placed it as low as $20 "for the entire outfit."

The schedule of articles to which defendant made affidavit embraces many articles, of no great value each, which seem not to have been in the house. The list foots up $336.45. Among the items are the following: "1 bed and mattress and springs, all complete, $25; blankets on said bed, $5; sheets on said bed, $2; pillows on said bed, $1.50; 1 bed, mattress, bedding and pillows, $25; cooking utensils (not otherwise herein enumerated), $25; kitchen cooking stove, $30; 1 large parlor stove, $25; 1 kitchen cupboard, $15." Other articles are set down at values much in excess of the value placed upon them by witnesses. Defendant submitted no evidence of values nor did he controvert the testimony of witnesses as to the contents of the house which covered the time shortly before the

fire occurred. These witnesses were accustomd to life in the hills on stock ranches such as the Dufur place, remote from markets and in cabins scantily furnished as this one was, and they testified to a general knowledge of the cost or value of such articles as entered into the outfitting of the Dufur house. Concededly there was no open market cr established market value of these articles at the place where destroyed, and especially was this true of old furnishings. The principal articles had been in use since 1906 and were then "second hand," and practically all of them had been in use from that date forward. We might almost safely say that with the description given by the witnesses, the jury would be authorized to pass upon values without the aid of expert testimony. Certain it is that the testimony given was the best available, and in the absence of any evidence to the contrary, the jury were justified in accepting the values testified to.

4. Error is assigned in admitting the claim and the proof of loss, which were one and the same instrument, on the ground that "it was incompetent and not identified as coming from the defendant." At the time Mr. Ridling met defendant, referred to in paragraph marked 2 above, defendant furnished Ridling an itemized statement of the contents of the house. This was on October 2, 1916. On the next day defendant presented the statement and witness told him to have it sworn to before a notary. Defendant took the statement and on October 4th defendant returned it to witness duly sworn to as of that date. "Q. What did he say to you in reference to the document that he handed to you, and the values therein set forth? A. He said that is the value, what he claimed was his loss. Q. What further conversation did you have with Mr. Dufur at that time? A. Mr. Dufur and I could not agree as to the amount of his loss and he requested proof of loss, blank proof of loss for him to make out, which I gave to him. Q. I will ask you to examine these two documents, in reference to the form first, Mr. Ridling. Did you hand Mr. Dufur two proofs of loss similar to those? A. Those are the identical proofs that I handed to him; yes, sir. Q. And where did you give them to Mr. Dufur? A. In his office. Q. In this city? A. Yes, sir. Q. Now, Mr. Ridling, after you gave these two blank forms of proof of loss to Mr. Dufur, when did you next see them? A. He mailed them to the company's office, and they returned them to me." Wit-

ness testified that he "received the first proof upon the 7th of October, and after examining them returned them to defendant for amendment by registered mail. Q. Did you get a return card from Mr. Dufur that he had received them? A. Yes, sir [exhibiting the card which was introduced in evidence signed John F. Dufur]. Q. Now, Mr. Ridling, when did you next see the original proofs of loss? A. Upon the sixteenth day of October I received the amended proofs of loss. Q. And they were certain proofs of loss with certain additions and slips attached thereto. A. Yes, sir. Q. Who handed them to you the second time? A. Mr. Stealey. Q. Did you see the envelope in which they came the second time? A. This is it, the second time [showing envelope]. . . . Mr. Nelson: Q. This exhibit marked 6 is the one you received on October 5, 1916, and again on October 16, 1916? A. Yes, sir. . . . Q. Do you identify these exhibits, People's Exhibits Nos. 6 and 7, as having been handed to you in this envelope [showing envelope]? A. Yes, sir. Q. Both of them in the one envelope? A. Yes, sir. Q. You received them on October 7, 1916? A. Yes, sir. Q. And then again on October 16, 1916? A. Yes, sir, they came back in that envelope. Q. They both came back in that envelope? A. Yes, sir."

The envelope was then introduced and was indorsed:

"John F. Dufur, Eureka, Cal.          Four 2 cent stamps Registered No. 1420. Ten cent registry stamp. Return Card Required. (143) Newark Fire Insurance Co. San Francisco 76695          California.

332 Pine Street. Old office 304 and 310 Kohl Bldg.

Post marked on back Eureka Cal Oct 14 1916, Registered. San Francisco Cal Oct 15 1916."

Notary Dickson identified his signature to the first proof made October 4th. "Q. Can you identify John H. Dufur's signature there? A. No, I am not familiar enough with his signature to do that. Q. Well, did he subscribe the paper in your presence? A. Well, I presume he must have done so, although my recollection does not serve me on that point." The witness stated he had "no recollection about it"; that he had seen Mr. Dufur write and had seen his signatures and was of the opinion that this was his signature but would not say so positively.

Notary Frost, before whom the proofs of October 14th were sworn to, was called as a witness and defendant's counsel ad-

mitted the signature of defendant to be attached to the proofs. Witness was then shown defendant's signature on the envelopes above referred to and after having qualified himself to testify as to defendant's signature, he testified: "Well, in my judgment I would say that I am convinced that the name of John F. Dufur in the upper left-hand corner of each one of those envelopes is the signature of John F. Dufur, the gentleman sitting there." All this evidence was admitted under objection and after it was all in, defendant moved to strike it from the record, which motion was denied, and the contention now is that "at the best such evidence merely raised a presumption that the proof of loss was presented to the insurance company."

Counsel cited many cases to the effect that "every fact necessary to a conviction must be proven beyond a reasonable doubt, and no presumptions are to be made against the defendant." The argument is thus stated: "At the most the evidence only shows the claim and proof of loss to have been in the possession of the insurance company, after having been in the possession of the defendant. But it does not show such paper was delivered or presented to the company by the defendant, or that it and the envelope in which it was contained were sent by him or even with his knowledge, much less with his consent. The presumption of delivery which follows from the possession of an instrument cannot be indulged in opposition to the presumption of innocence, where a material element of a criminal charge is involved."

We think the jury had something stronger than a presumption to justify their implied finding that defendant not only executed these proofs, but did so with intent to present them and did cause them to be presented by transmission through the mail. It is inconceivable that after defendant had executed the documents and had sworn to them before notaries and had inclosed them in envelopes indorsed and registered by him and directed to the insurance company, that some other person got possession of them and dropped them into the postoffice at Eureka without defendant's knowledge or consent. At no time after investigation began of his good faith in making claim of loss did he disavow executing and sending these documents, but, on the contrary, sought to show by witness Ford, who had acted as his attorney at one time, that he consulted Mr. Ford as to the values he had placed

on the various articles claimed to have been destroyed by the fire. It would tax human credulity to the breaking point to attribute the sending of these proofs to the insurance company by any person other than defendant.

Furthermore, section 549 of the Penal Code embodies two crimes, first, the presenting or causing to be presented any false or fraudulent claim, etc., and, second, the preparing, making, or subscribing any affidavit or proof of loss with intent to present the same, or to allow it to be presented, etc. Evidence of the presentation of the claim is admissible in support of the second crime mentioned in the section, but the crime as charged in the information might be established without proof that the claim was actually presented.

5. Error is urged in giving the following instruction: "Certain facts are admitted in this cause, and hence it is proper that the court refer to them. There is no contention but that there was a building and barn at the place designated in the information, and that in this building there was certain personal property and in the barn there was hay which belonged to A. D. Dufur; that this property was insured by the Newark Fire Insurance Company of Newark, New Jersey, and that if any loss by fire occurred to said property, such loss, if any, was payable to A. D. Dufur; that the defendant was the attorney in fact for said A. D. Dufur at the times mentioned in said information; that there was a fire, and the dwelling-house and contents therein and the barn and the hay therein were destroyed by said fire. As to those facts there is no contention and you must find accordingly."

There was sufficient evidence to have justified the jury in finding the facts stated in the instruction. The record, however, does not show that they were admitted by the defendant. On the contrary, the plea of "not guilty" put in issue every material fact, and though not controverted by countervailing evidence, it was the right of the defendant to have the jury pass upon every material fact. Section 19, article VI, of the Constitution declares that: "Judges shall not charge juries with respect to matters of fact, but may state the testimony and declare the law." The court took from the jury or, what is the equivalent, directed them to find the enumerated facts, leaving substantially only the alleged making of the affidavit with the intent alleged and the value of the property destroyed to be found by the jury. The attorney-general cites

*People* v. *Perry,* 65 Cal. 568, [4 Pac. 572], and *People* v. *Christensen,* 85 Cal. 568, [24 Pac. 888], where it was held that a mere statement of the evidence is not a violation of the Constitution. But the instruction is not a "mere statement of the evidence"; it is a statement that certain material facts were admitted; that there was no contention as to them and that the "jury must find accordingly." It was said in *People* v. *Gordon,* 88 Cal. 422, 426, [26 Pac. 502, 504] : "While section 19, article VI, of the Constitution allows judges to state the testimony to the jury, yet this principle has always been strictly enforced, and necessarily so, for that judges must not charge juries with respect to matters of fact is a constitutional prohibition which has been jealously guarded and rigidly upheld from the earliest judicial history of the state"; citing *People* v. *Williams,* 17 Cal. 147. See remarks of Mr. Justice Sloss in *People* v. *MacDonald,* 167 Cal. 545, 550, [140 Pac. 256] ; *People* v. *Carder,* 31 Cal. App. 355, 357, [160 Pac. 686] ; see, also, note in Treadwell's Constitution, p. 344, where the cases are collected.

There are some other assignments of error which we do not deem it necessary to consider. A number of collateral matters were gone into by the district attorney which had little, if any, bearing upon the issues. The statement made by the witness Baxter respecting an insurance policy distinct from the one in question we think was irrelevant. Some matters introduced as tending to show intent might well have been omitted as too remote to have such tendency. We think there was evidence upon all issues sufficient to support the verdict if the jury had been permitted to exercise their own judgment upon all the evidence. Inasmuch, however, as the court took from the jury certain material facts and directed a verdict as to them, it becomes imperative upon the reviewing court to hold this to have been prejudicial error.

The judgment and order are reversed.

Burnett, J., and Hart, J., concurred.