[Crim. No. 1387. Third Appellate District.—January 24, 1935.]

THE PEOPLE, Respondent, v. CHARLES A. MENNE, Appellant.

Ernest Spagnoli for Appellant.

U. S. Webb, Attorney-General, and Ralph H. Cowing, Deputy Attorney-General, for Respondent.

PLUMMER, J.—The appellant in this action was convicted on four separate counts of an information charging the issuing and passing of fictitious checks in violation of section 476 of the Penal Code, and also upon one count charging conspiracy based upon section 182 of the Penal Code. The defendant's motion for new trial having been denied, this appeal is prosecuted.

The transcript shows that at the times involved in this action the defendant had residing with him a nephew by marriage named Fred Cutts, of the age of about sixteen years. The defendant during all the times mentioned in this action was the owner of a Graham truck, and had previously been engaged in buying and selling farm produce. Cutts was living with the defendant at the defendant's home in the city of Stockton, and according to his testimony worked for Menne in buying, selling and transporting farm products from farms to market places. In July and August, 1933, it appears that the defendant took the boy Cutts with him, and called upon several farmers in San Joaquin County and made arrangements for buying certain specified parts of their produce, melons, cantaloupes and sweet potatoes. It also appeared that at different times the defendant and Cutts went to Watsonville, where they secured truckloads of apples, which were marketed in different localities.

In the month of July or August, 1933, the defendant and Cutts visited different ranches, as we have stated, in San Joaquin County. The first rancher mentioned in count one of the information was a man by the name of Pimentel, who owned a small tract of land near the city of Stockton. The defendant was well known to Pimentel, having theretofore bought produce from his farm. The defendant introduced Cutts to Pimentel as his nephew; asked Pimentel for quotations on watermelons and cantaloupes, stating to Pimentel that he had discontinued the produce business and that his nephew was going to haul produce for some Sacramento concerns.

A few days after the Pimentel transaction the defendant and Cutts called at a ranch owned by M. F. Mello, and purchased a quantity of watermelons. The same parties likewise called at the ranch owned by one C. P. Silva, named in the fourth count of the information, and made arrangements to purchase watermelons and sweet potatoes. The fifth count in the information charges conspiracy to pass fictitious checks, etc.

The boy Cutts became a witness for the state, related all the details of the transactions to which we have referred, and the circumstances connected with the commission of the several offenses, and testified that the defendant gave him for use the four fictitious checks passed by him.

Upon this appeal it is contended by the appellant that there is not sufficient corroborating testimony, as required by section 1111 of the Penal Code, to connect the defendant with the commission of the offenses with which he is charged.

Two checks were passed upon Pimentel, furnishing the basis for counts one and two of the information. These checks are in the following words and figures:

"Clearing House No. 10 No. 191
 Sacramento, California, July 5/1933 192
 Pay to the order of M. Pimentel..................$27.50
 Twenty-seven Dollars—fifty—Dollars
 To the Citizens Bank of Sacramento
 Commercial-Savings
 McCann Produce Co.
90–645 Sacramento, California.
 By J. S. McCann."

"Clearing House No. 10 No. 190
 Sacramento, California, July 5/1933 192
 Pay to the order of M. Pimentel..................$25.00
 Twenty-five Dollars..............Dollars
 To the Citizens Bank of Sacramento
 Commercial-Savings
 McCann Produce Co.
90–645 Sacramento, California
 By J. S. McCann."

We quote the following from the testimony of Pimentel in relation to the two checks just set forth: "Q. Tell the court what you said to Mr. Menne, and what Mr. Menne said to you when he came down there, in the presence of the people you have indicated? A. He came to the place and introduced the boy to me, and said he was not going to buy and haul any crops that year, but the boy was going to do it with his own truck, and it was a good Sacramento Company and good checks, and everything. Q. Did Mr. Menne say anything to you there? A. He said he was going around to see the things, and then he would come back a little later. Then, when I came home that night there was a little note home—I think my little girl said the boy delivered it—he wants three tons of watermelons for the next day."

Thereafter, Cutts called at the Pimentel ranch with the Graham truck belonging to the defendant, and received two loads of watermelons and cantaloupes. The watermelons were of the striped variety known as the rattlesnake melons. Cutts testified that Menne took possession of both loads of watermelons. In payment of the first load Cutts gave to Pimentel the first check which we have set forth. As payment for the second load the second check which we have set forth was given to Pimentel. Upon cross-examination Pimentel testified as follows: "Q. Who opened the conversation? A. Well, Mr. Menne started first, and then they started talking together. Q. Did he take part in the conversation, or did he say anything? A. Menne introduced the boy to me. Q. Did he introduce him by the name of 'Fred Cutts' or 'Freddie'? A. I don't remember. Q. Have you any recollection as to the name under which he introduced him? A. Well, he said something, that he was his nephew, or something like that. Q. And after he introduced him to you what did Mr. Menne say? A. 'The boy is going to run the truck' he said; he was not going to run it back here; he has a good job; he is making $200. a month in some business, and the boy is going with the truck from Sacramento from the same houses he bought for before, and he was going to bring the checks right from the houses. Q. What was the full conversation? A. He asked first how much the melons were, the price, and then I told him. Q. Menne said, then, as I understand you, that the Cutts boy was working for a Sacramento firm that he had been

working for for two years? A. No; the boy is going to haul the truck up there, a good house in Sacramento, the same place that he used to haul to before. Q. Did he say who they were? A. No. Q. What did he say about the checks? A. That he was going to bring the checks right to me in my name. Q. Just what language did Menne use? A. He said, 'He will bring the checks made out in your name.' Q. Did he, (Menne), use the words 'Cutts'? A. Well, he said 'the boy'. Q. He pointed to the boy and said, 'The checks will be made out in your name?' A. Yes. Q. Did he say they were going to be 'good checks'? A. Yes; I be afraid of the boy to give him the crop, if not. Q. He told you they were going to be 'good checks'; he put you wise that the boy was going to give you some 'good checks'? A. Also, he told me in the same way, so that I was not afraid to sell the crop to the boy—'The boy is going to bring you good checks.' Q. Did he use the words 'good checks'? A. He said, 'The boy is going to bring the checks from a good house in Sacramento, the same place as I hauled to before.' "

Cutts testified that the striped watermelons obtained from Pimentel were taken to Napa and there sold by the defendant. A witness by the name of Thyther testified that she rented a fruit stand to Menne at Napa and that defendant sold from the fruit stand the load of striped melons. The defendant admitted selling melons and cantaloupes at Napa, but claimed that he bought them from a man by the name of Manuel Lopes, who lived in the Turlock district. The record shows that a man by the name of Manuel Lopes appeared as a witness for the prosecution, and testified that he sold no such produce to the defendant. A deputy sheriff testified that the Manuel Lopes who appeared as a witness was the only person by that name whom he could locate in the Turlock district.

The contention upon this appeal is that this testimony, and also the testimony relating to the subsequent transactions which we will set forth, shows only opportunity, and does not tend to connect the defendant with the commission of the offenses. This testimony, however, we think not only shows opportunity, but goes farther and lays the foundation for the transactions referred to; has for its purpose the establishment of confidence in the genuineness of the checks

which would be made out in the name of Pimentel by the Sacramento houses receiving the produce, and also had for its purpose the foreclosing of any further inquiry by the seller as to his receiving pay for the produce about to be turned over to the possession of the boy Cutts. Thus, the testimony shows not only opportunity, but also participation in the transactions about to be had.

The defendant assured Pimentel that his produce was about to be delivered to a good house which would pay for the produce by checks drawn in the name of Pimentel. Drawn in this manner, of course, Cutts could not obtain any money on the paper.

The foregoing testimony does not show specifically that the defendant encouraged or persuaded Cutts to deliver the two fictitious checks to Pimentel, but it very clearly establishes that he prepared the way for and induced Pimentel to accept whatever checks might be brought to him by the boy Cutts. It also establishes the fact that the defendant had knowledge of the character of the checks, and of the nonexistence of the houses which would issue the checks in the name of Pimentel.

While not aiding or abetting, by any words addressed to Cutts, encouraging him to pass the fictitious checks, it carried the payment part of the transaction up to a point where the fictitious checks would be accepted on the faith of what the defendant had stated.

The witness Grace Thyther testified that she lived about eight miles north of Napa City; that in the month of August, 1933, the defendant and the boy Cutts came to her residence and wanted to rent a fruit stand; that after having a conversation with the defendant she rented the fruit stand to the defendant for two days for the sum of $3; that he paid her $1.50 only for the rent of the place; that the defendant sold striped, or what are called rattlesnake watermelons, and also a few muskmelons; that she did not see the defendant after he left the stand; that the boy Cutts was with Menne at the time. The boy Cutts testified that the melons sold in Napa were the melons purchased from Pimentel; that the defendant was at the stand for two days.

The witness Joseph Thyther testified that he was the husband of Grace Thyther, and that his wife rented a fruit stand to the defendant in August, 1933; that he thought

it was along about the first part of August; that he fixed the date from the fact that they shortly afterwards, and on the 13th of August, went away on a trip. As we have stated, the witness Manuel Lopes testified that he sold no such produce to the defendant.

There is testimony in the record to the effect that after the Pimentel transaction the truck was repainted a different color, and a license plate which belonged to a "Fageol" truck was substituted for the one that really belonged on the "Graham" truck.

The witness Mello testified that about the 15th of August, the boy Cutts came to his place near Escalon with a truck; that at the time there was some person whom he could not recognize also on the truck; that it was about 7:30 in the evening; that after the truck stopped he heard talking, but could not understand the conversation. "Following, the boy came into the yard and asked if I had any melons to sell. I said, 'Sure'. He asked me if I could sell a couple of tons. I said, 'Sure; when do you want them'? The boy said, 'I would like to get them this evening.' I told him it was too late; that he could get them the next morning, and I told him the price—$13.00 a ton. He came back the next morning."

In payment of the melons Cutts gave Mello the check set forth in count 3, which is in the following words and figures:

"Clearing House No. 10 No. 908
 Sacramento, California, Aug. 16–33
 Pay to the order of M. F. Mello................$25.00
 Twenty-five Dollars only.........................Dollars
 To the Citizens Bank of Sacramento
 Commercial-Savings
 90–645
 THE HUMMELL PRODUCE CO.
 By JOHN J. HUMMELL."

Count 4 relates to the transaction had with C. P. Silva, the owner of a ranch, as we have stated, in San Joaquin County. Mr. Silva's testimony is as follows: "Q. Did you and Mr. Menne have a conversation there? A. He asked for the stuff and we agreed on the price. Q. He asked for the stuff? A. Mr. Menne. Q. What did he say? A. I said, 'I have got watermelons and sweet potatoes'. Q. Did you

give him the price? A. I gave him the price, but I don't remember the price I gave him. Q. And when you gave Mr. Menne the price, what did Mr. Menne say? A. He said he was going to bring the boxes for the potatoes, and wanted some watermelons, too. Q. Did he say when he was going to do that? A. He said he was going to bring that in the last part of the week,—the boxes. Q. How long was Mr. Menne at your ranch at this time? Did he stay there very long? A. Not very long." "Mr. Menne came to my place at that time in a car, not in a truck." The witness Silva testified that in about two days the boy came with the boxes. Mr. Silva further testified that the boy took the boxes of sweet potatoes, but did not take any watermelons. The check given in payment for the sweet potatoes, and constituting the basis of the fourth count in the information, is in the following words and figures, to wit:

"Clearing House No. 10 No. 945
 Sacramento, California, August 19th, 1933.
 Pay to the order of C. P. Silva...................$70.00
 Seventy Dollars only...........................Dollars
 To the Citizens Bank of Sacramento
 Commercial-Savings
 THE CLARK PRODUCE CO.
 90–645 Sacramento, California.
 A. W. Clark Pay Roll Account,
 By A. W. CLARK."

Following the obtaining of the sweet potatoes, the boy Cutts testified that the defendant and himself took the sweet potatoes to the town of Jackson and there disposed of the same.

The witness Mrs. Katie Perovitch, called as a witness for the prosecution, testified that in August, 1933, she was residing in the town of Jackson; that in August, 1933, she saw the defendant at her place selling fruits and vegetables; that at said time she bought some sweet potatoes and cabbages from the defendant; might have bought some oranges and lemons; but did not remember; that she did not exactly remember the number of boxes of sweet potatoes she bought, but she thought she got ten or twelve boxes from him. Mrs. Petrovitch also testified that the boy Cutts accompanied the defendant. These sweet potatoes, according to

the witness Cutts, were the same sweet potatoes that were obtained from C. P. Silva.

In support of count number five the prosecution introduced the testimony of Nick Marosovic, who testified that he sold the defendant a load of apples at Watsonville, for which he received in payment check marked "People's Exhibit No. 5". This check is in the following words and figures:

"Bank of Amador County

Jackson, Cal. Date 3/28/33.

Pay to the order of C. A. Menne................$33.50

Thirty-three & 50/100........................Dollars

As payment in full for

Voss Washer. (Signed) J. B. MOORE.

(Cannot locate account)

Endorsed: 'C. A. Menne'."

The witness Cutts testified that he signed the name "J. B. Moore" to the foregoing check at the request of the defendant, at the defendant's home in Stockton. The witness Marosovic, who received the check introduced in evidence as "Plaintiff's Exhibit No. 5", testified that the defendant and Cutts came to his place at Watsonville to purchase apples, and purchased about eighty boxes thereof. There is also testimony in the record that the defendant sought to recover this check from Marosovic, but did not succeed in so doing, as the check had already been placed in the possession of the district attorney.

Following these various transactions the record shows that the defendant took the witness Cutts to Napa Valley and sought to obtain employment for Cutts at that place of one Suber, alleging that he wanted to get Cutts away from Stockton, for the reason that Cutts was in trouble with some girl. This was contradicted by Cutts. Failing to obtain employment for the boy in Napa Valley, the defendant took Cutts to San Francisco to the Potter Hotel, registering him under a fictitious name. After Cutts had been there about a week the defendant called for him and brought him to Stockton. Upon arriving in Stockton the defendant was arrested. Cutts, who was in the back seat of the automobile covered up with a blanket, was not discovered. The defendant was taken to jail and remained there about eight days, being released upon a writ of *habeas corpus*. In the

meantime the boy Cutts went to Placerville, where he obtained a job. After the defendant's release from jail he went immediately to Placerville, and according to Cutts, told him he had better get out of the state. A witness by the name of De Pety saw the defendant in Placerville at this time. From Placerville the defendant Cutts hitchhiked and rode freight trains to Castle Ford, Idaho, where Cutts found employment and remained there until he was arrested in May, 1934. While Cutts was in Idaho he received letters from the defendant under a fictitious name, and wrote letters to the defendant under the name of ''David Hahn'', and addressed them to other parties in Stockton, who delivered the letters to the defendant. While Cutts was in Idaho the defendant made three trips to see him. During the time Cutts was in Idaho he received the following typewritten letter from the defendant. There is testimony in the record that this letter, though unsigned, was written upon a typewriter belonging to the defendant. We quote from the letter the following portion: ''See that you don't get in a rumpus with any of those boys, or they will turn you in, you want to be damn careful about that. If you can't do that just slip out and make for the road, here's the latest dope on the road . . . now bear this in mind and let me hear from you at once, as to what you are going to do, if you are going to work say so, if not, get the hell out of there and don't let them damned farmers make a monkey out of you any longer. Answer this at once so that we know what you are going to do, you must make up your mind at once and do it, in the East I know you will be OK, because they will get you started there, at some damn thing and *everything will be absolutely safe for everybody,* this place has surely gone to hell.''

Not questioning that the testimony in the record is as summarized herein, the appellant contends that under the provisions of section 1111 of the Penal Code, it is insufficient to support a conviction. That section specifies that ''a conviction cannot be had upon the testimony of an accomplice unless it be corroborated by such other evidence as shall tend to connect the defendant with the commission of the offense, and the corroboration is not sufficient if it merely shows the commission of the offense or the circumstances thereof''.

In support of his contention the appellant cites a number of authorities to the effect that the corroborating testimony must do more·than raise a grave suspicion of the defendant's guilt, but must tend to connect the defendant with the crime itself, and not simply with the perpetrator thereof; that mere·association with the accomplice is not sufficient.

We do not need to review the authorities cited by the appellant, but will follow the rule laid down in *People* v. *Davis,* 210 Cal. 540 [293 Pac. 32], that the corroborative testimony must go further than raise a grave suspicion; must show more than the circumstances of the offense, but must also tend to connect the defendant therewith.

The testimony in this case shows the relationship of the parties, the fact that the defendant is well along in years, and that the accomplice Cutts was a boy slightly over the age of sixteen years. It also shows the conduct of the defendant preceding the commission of the offenses; likewise, his conduct after the commission of the offenses.

In the case of the *People* v. *Shurtleff,* 113 Cal. App. 739 [299 Pac. 92], where the question of corroborating testimony was being considered by the court, it was held that "the entire conduct of the defendant may be looked to for the corroborating circumstances, and if from those circumstances the connection of·the accused with the crime may fairly be inferred, the corroboration is sufficient". This rule is taken from the case of *People* v. *Nikolich,* 93 Cal. App. 356 [267 Pac. 721]. This statement of the law is also supported by the following cases: *People* v. *Yeager,* 194 Cal. 452 [229 Pac. 40]; *People* v. *Martin,* 102 Cal. 558 [36 Pac. 952]; *People* v. *Demera,* 64 Cal. App. 121 [220 Pac. 673]. The court in its opinion further says: "We may add that as we view our duty in this respect, we should give to all the evidence the full weight which the jury might have given to it, and should credit to the prosecution all inferences which the reason of the jury might sanction." In the Shurtleff case it appears that the defendant took part of the profit of the transaction, as well as performing other acts. In the instant case the testimony is that the defendant took the profits, the people to whom he sold produce testifying that they paid therefor to the defendant. As we have heretofore said, at the very beginning of the purchase of the produce the defendant laid the foundation for the trans-

actions, went with the accomplice Cutts, introducing him to the different ones from whom he was making purchases, especially stating to Pimentel the character of the houses from whom the checks would be forthcoming. The action of the defendant not only laid the foundation for the subsequent transactions, but was well calculated to create confidence on the part of those having produce to sell, and likewise tended to prevent the foreclosure of an inquiry as to the value or worthlessness of the checks until after the respective deals had been completed. The truck belonging to the defendant was one used by Cutts in obtaining the different loads of produce.

After the Pimentel transaction the truck was painted a different color; likewise, the truck belonging to the defendant bore a false license plate. The produce bought from Pimentel was exactly similar, or the same in kind, as that sold by the defendant himself in Napa County.

While there were no identifying marks on the sweet potatoes bought from Silva, the testimony shows that the defendant had, about the same time, or shortly thereafter, sold sweet potatoes to the witness Perovitch, at Jackson, Amador County, Cutts testifying that they were the same potatoes. The witness Perovitch made payment to the defendant. The subsequent action of the defendant in taking Cutts out of the state, and his advice to him while he was in Idaho, all tend to show the defendant's participation in the offenses set out in the information. Not merely is it shown that the defendant associated with the accomplice Cutts, but it shows active participation in the handling of the produce so obtained, and also, by his own statement to Pimentel, knowledge of the fictitious character of the checks, and likewise justified the jury in concluding that by the same means defendant was misrepresenting and aiding in the general scheme when stating the houses where the produce was to be sold were "good houses". Also, the testimony shows that the produce, instead of being taken to the alleged "good houses" in Sacramento, or elsewhere, was partly sold in the county of Napa, and partly sold in the county of Amador to private individuals, and not to houses at all.

The circumstances surrounding this case are quite similar to the circumstances as shown in the case of *People* v. *Eppstein*, 108 Cal. App. 72 [290 Pac. 1054], where the wife of

the defendant passed the fictitious check. There, as here, the defendant was not actually present at the time the fictitious checks were manually delivered. In that case, the same as here, other checks were admitted in evidence to show that a system had been agreed upon and was being followed in pursuance thereof. It appeared that in the Eppstein case a man drove an automobile from place to place, and at the different shopping places the wife passed the fictitious checks. The court, in passing upon the testimony in that case, used the following language: "While the jury may have thought it not improbable that the appellant was the man with whom Mrs. Eppstein rode about on the afternoon when all or some of the checks described in the information were passed, there is no direct evidence that such was the case. Yet, even if he was not in fact present, it seems to us that the evidence that he advised and encouraged his wife in what she did in passing the checks, though circumstantial, was sufficient to warrant the jury in so concluding." In the instant case, while the defendant is not shown by direct testimony that he actually, by word of mouth, other than the testimony of the accomplice Cutts, aided, abetted, encouraged or induced Cutts to pass the fictitious checks, it is shown that the whole plan of purchasing the produce was laid out by the defendant in his taking Cutts from place to place, introducing him to the different produce raisers, representing the good standing of the houses to which the produce would be sold, and that the checks would be made by those houses directly to the seller, followed by taking the produce so purchased and himself selling it to private individuals in other places. The conclusion seems to us unescapable that the defendant not only aided and abetted Cutts in passing fictitious checks, but simply used Cutts as a tool to accomplish his illegal purposes.

■ Appellant also urges that the *corpus delicti* of the offense was not proven, and that the fictitious character of the checks was not established, in that it was not shown that there were no such persons as those represented to be the signers of the respective checks.

The assistant cashier of the bank upon which the checks were drawn testified that there was no record of any kind in the bank under the names of the drawers of the checks. Such was the testimony of the witnesses Robert Spretch,

James J. Burke and S. C. Paxton. This contention of the appellant is expressly negatived by the opinion in the case of *People* v. *Reed,* 84 Cal. App. 685 [258 Pac. 463]. It is there said (quoting from the syllabus) : ''In a prosecution under section 476 of the Penal Code for passing fictitious checks, testimony that the name of the person signed to the check is not found in directories in the cities where the bank was located, or the check cashed, and was not disclosed by the record of the bank, was sufficient proof of the *corpus delicti* to render admissible defendant's admission that he had drawn the check and passed it by the endorsement.'' It is also further held in the Reed case that in a prosecution for passing a fictitious check it is not required to prove beyond a reasonable doubt that no person in the world existed under the name signed to the check. All that is required to be shown is the establishment of such fact to a common certainty that there is no such person. The instruction approved in that case to the jury was to the effect that ''it was only necessary to show to a common certainty that there was no such person in existence in the vicinity of the county of Sacramento and the county of Alameda connected with the particular acts charged in the information''. ■ The venue was properly laid and proven as being in San Joaquin County where the offenses alleged in the information were committed. Section 792 of the Penal Code places the jurisdiction against the principal who is not present in the commission of a public offense, in the same county where it would be if he were personally present in the commission thereof. The section of the code is a conclusive answer to the appellant's contention that the venue was not properly laid.

As to the *corpus delicti* being established, we may further cite the case of *People* v. *Cohen,* 113 Cal. App. 260 [298 Pac. 114], where it is said : ''There was evidence that the names appended to the four checks had no accounts in the banks upon which the checks were drawn. This constituted *prima facie* proof that the names were those of fictitious persons.'' (Citing a number of authorities.) The facts in the Cohen case, *supra,* are precisely similar to the facts in the instant case, where the record shows testimony to the effect that the names appended to the several checks had no accounts in the banks upon which they were drawn.

■ Appellant further contends that none of the counts in the information charge any offense known to the law, in that in every count the purport clause was omitted, in that it is not alleged in any of the counts that the names signed to the checks purported to be those of an individual, corporation, bank, copartnership or firm. In support of this contention appellant relies upon the case of *People* v. *Eppinger*, 105 Cal. 36 [38 Pac. 538], in which it was held that "a charge of making and passing a check with the averment that there is no corporation in existence of the name by which the check purports to have been signed, does not state an offense within the provisions of the section (sec. 476, Pen. Code), unless it is also averred that the name signed to the check purported to be the name of a corporation. If the name signed to the check is as apparently that of a corporation as of a copartnership it is necessary to allege which of the two it purports to be, and that the one so alleged has no existence," etc.

The information in the Eppinger case is readily distinguishable from the one now under consideration. In the Eppinger case the check was signed by "M. Howe & Company", and the information merely alleged that in truth and in fact there was no such individual as "M. Howe & Company" in existence. In the information under consideration, and in all the counts thereof, the checks purported to be the checks of certain produce companies. And it is then alleged that no such persons or individuals or firms or corporations or copartnerships were in existence. This language explicitly and positively negatived every form of organization known to the law authorized to issue checks.

In *People* v. *Carmona*, 80 Cal. App. 159 [251 Pac. 315], an information drawn precisely as the one in the instant case was upheld, and a hearing of that case in the Supreme Court was denied on February 3, 1927. Citation of this case is all that is necessary to show that the information upon which the defendant was tried and convicted is both amply and legally sufficient.

■ We find no reversible error in the conduct of the assistant district attorney during the course of the trial in asking that the wife of the defendant, who was upon the witness stand, be called or considered as a witness for the plaintiff. While such action on the part of the assistant

district attorney was improper, and no such request should have been made, the opinion in the case of *People* v. *Dufur,* 34 Cal. App. 644 [168 Pac. 590], shows that a similar request, and nothing more, not to be reversible error.

 The contention of the appellant that he was entitled to forty challenges is without merit. (See *People* v. *Kelly,* 203 Cal. 128 [263 Pac. 226].) Likewise the contention of the appellant as to errors of the court in the admission of the testimony of the different officers of the banks upon which the checks were drawn, that they found no accounts in the names of such persons, and that such persons had no accounts in the banks, is also without merit. (See the cases already cited of *People* v. *Carmona, supra,* and *People* v. *Cohen, supra.*)

There is also testimony in the record to the effect that the license inspector of the city of Sacramento was unable to discover the names of the drawers of the checks, and were also unable to discover the existence of any such persons in the city or county of Sacramento. We find no errors in the ruling of the court in sustaining an objection to an inquiry of Cutts as to how he expected the case to terminate in so far as he was concerned.

 It is further contended that the testimony of the defendant in the particulars where it was uncontradicted should have been accepted by the jury as a truthful statement of the facts, basing the argument upon the case of *People* v. *Mock Yick Gar,* 14 Cal. App. 334 [111 Pac. 1039]. In making this contention appellant overlooks or disregards the testimony to the effect that the reputation of the defendant was such as to render his statements unworthy of belief. In the face of such testimony it was within the province of the jury to determine what credence should be given to the testimony of the defendant, and whether they should accept as truthful any part of his testimony.

 It is finally urged that the court committed prejudicial error in its instructions to the jury. As to the witness Cutts, being an accomplice, the court instructed the jury as follows: "The court instructs the jury that an accomplice is one who, knowing that a crime is being committed, wilfully, feloniously, and with criminal intent, intentionally aids, abets, and assists another in the commission of such crime or criminal act, and whether or not one is an accom-

plice, as defined in these instructions, is for the jury to determine from all the testimony and circumstances in proof in the case.''

There being no conflicting testimony as to the witness Cutts being an accomplice, and* that fact standing undisputed in the testimony, the court should have specifically instructed the jury that the witness Cutts was as a matter of law an accomplice. (*People* v. *Ferlin,* 203 Cal. 587 [265 Pac. 230]; *People* v. *Parkinson,* 81 Cal. App. 618 [254 Pac. 612].) In this case, however, the reversal of the judgment was not based upon the error of the court alone in refusing to instruct that a certain witness was an accomplice. (See, also, case of *People* v. *Coffey,* 161 Cal. 433 [119 Pac. 901, 39 L. R. A. (N. S.) 704], and *People* v. *Truax,* 30 Cal. App. 471 [158 Pac. 510].)

The failure of the court to instruct the jury specifically that the witness Cutts was an accomplice is not reversible error for the reason that the case was tried upon the admitted fact that Cutts was an accomplice. Such being the case, the error of the court must be considered as not prejudicial. (*People* v. *Knoth,* 111 Cal. App. 250 [195 Pac. 577]; *People* v. *Ferlin, supra.*)

The instruction of the court to the effect that testimony that the drawer of a check did not have any account with the bank upon which the check was drawn was *prima facie* evidence of the fictitious character of the check, has been repeatedly held a proper instruction. (*People* v. *Cohen, supra; People* v. *Sheridan,* 136 Cal. App. 675 [29 Pac. (2d) 464]; *People* v. *Carmona, supra.*)

Objection is also made that in one of the instructions the court used the disjunctive ''or'' instead of the conjunctive ''and''. A reading of the instruction shows that the court properly instructed the jury as to all the essential elements of the law necessary for their guidance.

The appellant did ask that certain sections of the code relative to special verdict be read to the jury, but did not submit to the court any questions or request any questions to be submitted to the jury for them to answer.

That count No. 5 was not merged in count No. 1 is supported by the following cases: *People* v. *Martin,* 114 Cal. App. 392 [300 Pac. 130]; *People* v. *Keller,* 124 Cal. App.

673 [12 Pac. (2d) 1066]. Other cases might be cited, but these are sufficient.

Finding no reversible error in the record, the order and judgment are affirmed.

Pullen, P. J., and Thompson, J., concurred.

A petition for a rehearing of this cause was denied by the District Court of Appeal on February 8, 1935, and an application by appellant to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on February 21, 1935.