[Crim. No. 2407. Second Appellate District, Division Two.—February 13, 1934.]

THE PEOPLE, Respondent, v. P. H. SHERIDAN, Appellant.

P. H. Sheridan, *in pro. per.*, for Appellant.

U. S. Webb, Attorney-General, and John L. Flynn, Deputy Attorney-General, for Respondent.

ARCHBALD, J., *pro tem.*—Defendant was charged in an amended information, containing five counts, with five separate offenses of forgery (fictitious name) and with two prior convictions, one in California and the other in New York. He admitted the prior conviction in California, but denied the one in New York, and pleaded not guilty to the forgery charges. On motion of the district attorney count III was dismissed. The jury found defendant guilty on counts I, II, IV and V, and of the prior conviction in New York. From the judgments of conviction entered and the orders denying his motions for new trials he has appealed.

The evidence shows that appellant registered at the Hilton Hotel in Los Angeles as "John H. Gardner" at about 1:30 A. M. on February 21, 1933. At the time he stated he had an automobile and a chauffeur, but that he ran out of gasoline and left the car at the curb at Third and Alvarado Streets. Upon being told that he might get the garage man next door to bring the car in, he went into the garage, but came back, saying, "No, I guess I will leave it there." That evening, at about 8 o'clock, he asked the cashier to cash a check for $25 for him, saying that it was his aunt's and that his father and mother were in Palm Springs and would be in the hotel the next morning, and that he was to be a guest there for months; that if anything went wrong with the check his father would take it up. William W. Brophy,

the house officer, on being shown the check, went to appellant's room and asked where his aunt lived and for her telephone number so that they could ascertain if the check was all right. Appellant replied, "Oh, she is in Westwood. I can't think of the street number," or the telephone number, and said he did not want to be bothered any more. About 5:30 A. M. the next day appellant told the clerk of the hotel that a girl he had had in his room took his money, and said, "I want you to go with me and I will get the money and pay you back for the check," in response to which Mr. Brophy asked if he would not remain at the hotel and talk with the manager about the check. Appellant was told that no one could go with him from the hotel, but that they would get some police officers for that purpose. To this he replied: "No, I don't want no officers, I don't want anyone; if you can't go with me that is all right. I will go back to my room and wait until the manager comes down." A little later the manager arrived at the hotel and telephoned appellant's room, receiving no response. Mr. Brophy was then told to go up and see if appellant was there, but he found the room locked. Entering the room below, Brophy looked out of the window and saw an improvised rope, made of blankets and sheets, extending from the fourth floor, upon which appellant's room was located, to the third floor, where a skylight roof connected with the garage next door. Brophy then walked over the roof to the edge and saw appellant lying on the ground below. The latter was taken into the hotel by the manager and Brophy and from there to the hospital in a police ambulance.

The check so cashed purported to have been written by Margaret Lewis Gardner in favor of John H. Gardner, and was indorsed by appellant with that name prior to receiving the $25. The check was dated February 21, 1932 (apparently mistakenly so written). It was drawn on "Citizen's National Trust and Savings Bank, 1088 Westwood Ave., Westwood Village", and is the check mentioned in count I.

On February 18, 1933, appellant appeared at a grocery store with a check dated the same day, drawn on the Sixth & Alvarado Branch, Security-First National Bank, 2101 West Sixth Street, payable to the order of P. H. Sheridan for $15, and told the manager of the store that he knew him quite

well. The manager was not sure that he did, but thought he had seen the man before and had cashed his checks. It was early in the morning and there was insufficient money to cash the check presented. Appellant returned the next morning, Sunday, and bought about $2.50 worth of groceries. The establishment was still short of change, so the clerk gave appellant the balance of $5 and told him to come back Monday for the $10. That was the day appellant was taken to the hospital, so he did not get back. This check purported to be drawn by ''Murphy-Aldrich Co., H. L. Murphy'', and is described in count II of the information.

On January 6, 1933, appellant purchased eighty cents worth of merchandise from a delicatessen store at 8905 Santa Monica Boulevard, and presented a $10 check drawn to the order of ''cash'' on the security office of the Security-First National Bank, signed ''James R. Howard'', receiving the balance of such check in cash. Appellant told the proprietor of the store that he worked for James R. Howard, and he indorsed the check ''P. H. Sheridan''. This check is described in count IV.

Count V sets out a check purported to be drawn by ''Mary Arden Sheridan'' on the security office of Security-First National Bank for the sum of $50, payable to P. H. Sheridan and dated January 21, 1933. On or about that date appellant went into a clothing store and picked out an overcoat valued at $29, saying he would take it C. O. D. He returned to the store the next morning and presented the check mentioned. The proprietor did not know him and told him that if he would get someone to identify him he would cash the check. About an hour later appellant returned with ''a Dr. White'', who said he knew appellant and that he was ''O. K.'' The check was indorsed by appellant and accepted by the storekeeper, who delivered the overcoat and $21 in cash to appellant.

Appellant was identified by the witnesses who cashed the various checks as the man who presented them and obtained the respective merchandise and sums of money. Evidence was introduced showing that none of the supposed makers of such checks had accounts in the banks upon which they were drawn. A handwriting expert compared the writing on each of the four checks with an exhibit proved to have been in the handwriting of appellant, and testified that it

was his opinion "that the same person who wrote the handwriting on People's Exhibit 5 could have written, and probably did write, the pen and ink writing on these four checks. The amount of standard writing I have is quite limited, and that is the reason I don't feel justified in making a definite, positive statement; but I see many similarities in the writing of these checks that would lead me to believe that the same person wrote the checks who wrote the handwriting exemplar. Also, with reference to the endorsements on each one of these checks, it is my opinion those endorsements were written by the same person who wrote the handwriting exemplar." An officer testified that he had a conversation with appellant at the hospital and that the latter said his name was Gardner. The officer showed him a draft (not involved here) and asked if that was the one he gave a Mr. Close, to which appellant said (quoting): " 'Yes.' I said 'Then, your name is Sheridan?' He said, 'Yes.' He said, 'Anybody that would take one of them pieces of paper is a —— fool.' " At a later conversation the officer testified that he showed appellant the four checks involved here and that the latter said he made them and told the officer where he passed them.

In the course of the trial there was introduced in evidence as People's exhibit 7 a record of conviction in the state of New York of one Andrew J. Sloan, *alias* Paul D. Sheridan, which, in addition to the indictment, minutes of conviction and sentence shows the man sentenced was confined in Sing Sing prison. The prison record shows photographs and fingerprints of such inmate. Appellant took the stand in his own behalf and admitted passing the four checks mentioned, but denied that they were fictitious. On cross-examination he admitted having been convicted of a felony in California, but denied having been convicted in New York. He was shown the photograph attached to the record of conviction in New York and asked if it was his. He answered that he did not know whether it was or not. He was then asked and required to answer, over his objection that it was improper cross-examination, that he had had "his fingerprints taken", presumably in New York. He also testified, without objection, that he had his picture taken. The district attorney may have intended to limit the query to the state of New York, but did not. Appellant urges that it was error

to overrule the objection noted, and that in so doing the court compelled him to be a witness against himself, as he was examined as to a matter not testified to on his direct examination.

■ If a defendant takes the witness-stand at his trial he becomes, as such witness, subject to the same rules for testing his credibility before the jury, by impeachment or otherwise, as any other witness (*People* v. *Hickman*, 113 Cal. 80 [45 Pac. 175]), and "he may be cross-examined by the counsel for the People as to all matters about which he was examined in chief". (Sec. 1323, Pen. Code.) The Supreme Court has said that the effect of the quoted clause of the Penal Code "is to take from the court any discretion which it might ordinarily exercise in allowing the range of a cross-examination to extend beyond the matters brought out upon the direct examination" (*People* v. *Gallagher*, 100 Cal. 466, 475 [35 Pac. 80, 83]). ■ Applying the rule so laid down to the instant case, we are forced to conclude that there was nothing in the direct examination of defendant which the answers to the questions so objected to explained, qualified or destroyed the force thereof in any way. In our opinion, when the witness denied that he had been convicted in New York, nothing having been brought out regarding such conviction on direct examination, the People were limited to proving otherwise than by cross-examination of defendant that he was so convicted, and thus that his denial was false.

■ We fail to see, however, where appellant was in any way prejudiced. He may have had many pictures taken in New York, and may have been a depositor in some postal savings bank in that state and had his fingerprints taken there as a proper means of identification. Be that as it may, the pictures on the record of conviction were such a good likeness of appellant that he would not say they were not "his pictures", on being shown them, even though he would not admit that they were; and such pictures and fingerprints have such distinctive features that no mistaken comparison could possibly be made by even the most inexperienced observer. The jurors had the defendant before them, as well as fingerprints admittedly made by him, and we cannot assume that they disregarded such unmistakable evidences of identity and assumed contrary thereto, if there was no similarity, that when appellant answered that he did

have his picture as well as fingerprints taken in New York he meant the pictures and fingerprints shown by the prior record.

After the question, "Did you have your picture taken?", which appellant answered in the affirmative, the following took place: "Q. While you were in the penitentiary. Now, calling your attention to People's exhibit 1, Margaret Lewis Gardner, who is that person? A. That is my aunt." Appellant urges that the statement "while you were in the penitentiary" constitutes misconduct. It was not a question, but was apparently a voluntary statement by the prosecuting attorney. Defendant evidently did not consider that such statement was prejudicial at the time, as no objection was made nor any request that the jury be admonished to disregard it. Under the circumstances we fail to see how the claim of misconduct can be upheld. (*People* v. *Jacobs,* 73 Cal. App. 334, 349 [238 Pac. 770].)

In our opinion the record of conviction in New York was properly admitted in evidence. An objection was made to its introduction on the ground that the certificate attached thereto did not contain the recital, except by inference, that the official authenticating the record was the official custodian. The exemplified copy of the record of conviction is certified to by the clerk of the court, under the seal of the court, which rendered the judgment of conviction, and the signature of the clerk and his official character is attested by the judge of such court, whose signature and official character is in turn certified by the clerk of the county of New York under the seal of the county. Such record of the judgment of conviction would be sufficient to prove the prior conviction in New York, except for the fact that there is no evidence identifying the Andrew J. Sloan, *alias* Paul D. Sheridan, mentioned therein, as the Paul H. Sheridan involved here.

The prison record, above referred to, is certified to by the "Director of the Division of Criminal Identification in the New York State Department of Correction", and has attached to it a letter from the commissioner of such department transmitting the record to the office of the district attorney. No objection seems to have been made to the receipt of such letter in evidence as a part of the exhibit, but only to the fact that the record is not certified to by the "official custodian", as provided in section 969b of the

Penal Code, which provides that such a record when so certified may be introduced in evidence for the purpose of establishing *prima facie* evidence of a prior conviction.

Under the laws of New York the commissioner of the department of correction of the state has the superintendence, control and management of the state prisons and of the prisoners therein (art. VI, sec. 112, Correction Law, Book 10–B, McKinney's Consol. Laws of N. Y., p. 39), and appoints the wardens of such prisons (art. II, sec. 18, p. 23). Such commissioner is required to make or have made impressions of the fingers and thumbs of all prisoners in the state prisons, to cause such prisoners, in his discretion, to be measured and described in accordance with the Bertillon method for identification of criminals, and to cause such impressions and measurements and statements to be made and taken by a person or persons in the official service of the state (art. XXII, sec. 618, p. 183) ; and it is made the duty of the officials in charge of the penitentiaries to measure and describe said prisoners in accordance with said Bertillon system, to procure as far as possible *modus operandi* statements from all such inmates and to cause *duplicate* records of such measurements, impressions and statements to be transmitted daily to the department of correction (art. XXII, sec. 619, p. 184). It is also made the duty of such commissioner of correction to file, or cause to be filed, in the division of criminal identification all such measurements, statements, photographs, etc., so furnished him, and to furnish upon application such photographs, measurements, statements, etc., of any person of which there is a record in the office of the department of correction to officers of other states among others effecting reciprocal interchange of similar records with said department and peace officers of the state of New York (art. XXII, sec. 621, p. 185). Such commissioner is authorized to delegate any of his powers or direct any of his duties to be performed by the head of a division, except the power to appoint or remove officers and employees and to fix their salaries (art. II, sec. 5, p. 16). He is authorized to appoint such subordinates as may be necessary for the exercise of the powers and performances of the duties of the department (art. II, sec. 9, p. 18), and the division of criminal identification, records and statistics is created and the commissioner is authorized to appoint a

statistician and such other assistants as may be necessary in said division (art. II, sec. 15, p. 21). The certificate attached to the prison record is made by the director of the division of criminal identification, and in our opinion, in view of the contents of the exhibit, the certification thereon and the law of New York, it is sufficiently identified as coming from the official custodian of such records.

So far as the pictures and fingerprints are concerned, they would seem to either prove or disprove, by comparison with the proved fingerprints and the subject photographed, the identity of the defendant with the prisoner confined in Sing Sing prison and named in the certificate above mentioned, to say nothing of the statement in such certificate which shows that such person was confined in San Quentin prison in September of 1924 for a violation of section 476a of the Penal Code of this state—issuing checks without sufficient funds—which is the prior conviction admitted by appellant here, and which statement, under the law mentioned, we must assume was obtained from the prisoner named in the record.

We see no merit in the contention that appellant was denied his constitutional right to compel the attendance of witnesses. We must assume that his attorney would have issued process to secure the attendance of any witnesses favorable to appellant's case, if any of whom he was advised could be found. Nor is there anything in the record showing a request for such process or a refusal by the court to issue same.

Neither do we see any misconduct when in response to a statement by defendant's attorney to the effect that the defendant wanted to stop the trial and get "a good lawyer", and that he, defendant, would rather represent himself than have his counsel do so, the court said: "He couldn't get a better lawyer than you, and we won't be bothered with such trifling requests on his part. Proceed with the trial." The record before us shows that the following then occurred: "The defendant: If . . . " Appellant in his brief states that what he said was: "If the court please, my objection is not to counsel, but to the fact that none of my witnesses have been subpoenaed," and that the court then said, as shown by the record, "You be seated. Go ahead." Appel-

lant makes no claim that he could have obtained the presence of the alleged fictitious persons, but does state that "four of these witnesses were present at the scenes of these transactions and were personally acquainted with individuals and firms alleged to be fictitious". Just why such persons and not the makers of the checks were desired does not appear, if the makers were not in fact fictitious.

Appellant urges that there is no evidence of an intent to defraud, nor of the fictitious character of the checks. The evidence showed conclusively that the alleged makers of the checks had no accounts in the banks upon which they were drawn. Such testimony is *prima facie* evidence of the fictitious character of the checks. (*People* v. *Eppinger*, 105 Cal. 36 [38 Pac. 538]; *People* v. *Thal*, 61 Cal. App. 48 [214 Pac. 296]; *People* v. *Roche*, 74 Cal. App. 556 [241 Pac. 279]; *People* v. *Cohen*, 113 Cal. App. 260 [298 Pac. 114].)

That he passed the checks is admitted by appellant, but he denies that he knew they were fictitious. So far as count I is concerned, the facts concerning his actions and statements in passing the check, as well as his conduct afterwards when he knew the hotel management was investigating as to its validity, were sufficient for the jury to infer that he well knew its character. We also have his confession to the officers, which, if accepted by the jury, clearly established such knowledge as to all of the checks, to say nothing of the evidence connected with the passing of each instrument and appellant's own explanation of his receipt thereof and the existence of its makers. We do not see how the jury could have arrived at any other conclusion than they must have reached as to such intent.

In our opinion there was no error in giving the instructions of which appellant complains, or in modifying certain instructions requested by him. Two instructions which were requested were refused. The first in effect advised the jury that it should not be prejudiced against defendant by reason of the fact that the information contained several accusations; that such fact did not add to the weight of evidence against him on any one offense, and that each count in the information was to be considered separately and upon the evidence as to such count only, without reference to accusations or evidence of other offenses. It might well

be questioned whether the instruction as presented should have been given. As a general proposition it may correctly state the law, which, however, is largely a commonplace and should be in the mind of every intelligent juror on the panel without being reminded of it. As presented, however, it might have been misunderstood. Considerable evidence was given concerning the registering of appellant at the Hilton Hotel under the name of John H. Gardner; and the stories told by appellant, under the instruction, might have been construed as applying only to count I, and in the main that is correct. They were of such a nature, however, that the jury might well have considered that they had a serious bearing on the credibility of appellant as a witness; and under the instruction the jury might have been in doubt as to whether his acts and improbable statements could be so considered in weighing his evidence on the other counts. In our opinion there was no error in refusing to give such instruction.

The other instruction refused related to circumstantial evidence, and we see no error in refusing it as the evidence presented directly involved appellant.

Nor is there any variance between the charges contained in the information and the proof. Appellant was charged and convicted under section 476 of the Penal Code.

We agree with appellant's contention that in view of the fact that expert witnesses were used by the prosecution, both to prove that defendant wrote the checks passed and to identify the fingerprints on the New York prison record as being those of appellant, an instruction should have been given under section 1127b of the Penal Code. This same question was before us recently in the case of *People* v. *Williamson*, 134 Cal. App. 775 [26 Pac. (2d) 681], and we there held that such section was mandatory, and that in a case where expert witnesses are used an instruction should be given substantially as required by the section, whether requested or not. A petition for a hearing of such cause in the Supreme Court after such decision was denied December 2, 1933. We are of the opinion, however, that such failure had no effect on the jury's verdict in the instant case, and that the same result would have obtained if such an instruction, as well as those refused, had in fact been

given, and that no prejudice resulted from the failure to give them.

Judgments and orders affirmed.

Stephens, J., and Craig, J., concurred.

A petition by appellant to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on March 15, 1934.