[Crim. No. 584.   Fourth Dist.   Feb. 19, 1948.]

THE PEOPLE, Respondent, v. NORFIO BRANCATO et al.,
Appellants.

David E. Peckinpah and Denver C. Peckinpah for Appellants.

Fred N. Howser, Attorney General, and Howard S. Goldin, Deputy Attorney General, for Respondent.

BARNARD, P. J.—The defendants were charged with robbery, with prior convictions. They admitted the prior convictions, and a jury found them guilty of robbery in the first degree. They have appealed from the judgment and from an order denying their motion for a new trial.

About 2 a. m. on the morning of April 18, 1947, two men armed with revolvers came into the card room of a so-called cafe in Fresno, through an alley entrance. Among other things, one of these men wore a pair of black gloves and the other had on a two-tone brown jacket. At the point of a gun the occupants of the room, who were engaged in gambling, were robbed of something over $3,000 in currency and some watches and jewelry. The wife of one of the owners of the cafe, coming to get her husband, parked her car in the alley near this entrance. She saw a Cadillac car parked across the alley from her. She took the number of this car, which she later reported to the police. While she was waiting the two defendants came hurriedly out of this entrance, entered the Cadillac and drove rapidly away. She positively identified them, as they passed within a few feet of her and under a floodlight.

The robbers had ordered the men not to move until five minutes after they left and had pulled out the telephone so it could not be used. The police department received a call concerning the robbery at 2:25 a. m. A description of the automobile and a description of the two robbers was then broadcast by radio. At 3:25 a. m. a call was received from the sheriff's office in Madera stating that this car, with two occupants, had been picked up by the city police. The defendants were taken to the sheriff's office where they were searched. Each of them had about $900 in currency on his person. A revolver, similar to the one used in the robbery, was found in a suitcase in the car. Another similar revolver was found the next morning between two rose bushes near where the Cadillac was parked at the sheriff's office in Madera. A pair of black gloves was found in the pocket of one of the defendants. One of the Madera officers testified that Pedrotti, when he first saw him, was dressed according to the description broadcast from Fresno. While Brancato had on a different coat, a two-tone brown jacket similar to that worn by one of the robbers was in the Cadillac car. It was stipulated that this car belonged to Brancato.

Shortly after 3:25 a. m. one of the victims was taken to

Madera where he identified the two defendants as the ones who had committed the robbery. Later, at the Fresno jail, other victims so identified them. At the trial, the woman who was parked in the alley identified the defendants as the two men she had seen hurrying from the entrance and entering the Cadillac. Some six or eight witnesses identified the defendants as the ones who had robbed them. Two of the victims were less positive in their identification. One witness, Tommy Davis, a 19-year-old boy who worked in this cafe, testified that the defendants did not look like the hold-up men.

Pedrotti did not take the stand. Brancato testified that he lived in Los Angeles and was a professional gambler; that he came to Fresno on the afternoon of April 16; that he visited gambling establishments looking for a man who had given him a bad check a year and a half before; that he met Pedrotti, whom he had known for two years in Denver and other places; that Pedrotti had arrived that day from Denver; that they took a room together at a motor court near the north edge of Fresno; that about 11 p. m. on April 17, he and Pedrotti went out to the Pine Lake Lodge, some four or five miles north of Fresno, to see his friend "Goody Blum"; that they were in Blum's cabin there from about midnight until they left; that Blum joined them about 1 a. m. and stayed with them until they left at 2:45 a. m.; that they decided to go to Sacramento and returned to the motor court, packed their grips, and started; and that they were stopped "as we were almost through Madera." Blum testified that he was with the two defendants at his cabin at Pine Lake Lodge between 1 a. m. and 2:30 a. m on this night, and that he remembered the latter time because a woman employee of the lodge brought him his keys and told him it was 2:30 a. m. This woman employee testified that she went to this cabin with the keys at 2:30 a. m. or shortly thereafter, and saw the two defendants there.

The defense rested entirely on the alibi claim. In spite of that claim this is not a close case. The guilt of the defendants was shown by very strong evidence, both direct and circumstantial. The defendants' main contention is that the district attorney was guilty of prejudicial misconduct throughout the trial, which amounted to an appeal to the passion of the jurors, and that without such misconduct the jurors might have believed the testimony of their alibi witnesses. It may be observed that while it might be possible for them to have

been at Pine Lake Lodge about 2 :30 a. m., if they had committed this robbery, it is hardly possible that they could have left there at 2 :45, returned and packed their grips, driven to the north edge of Madera, been stopped and taken to the sheriff's office, and a report made to Fresno by 3 :25 a. m. Also, the testimony of both Blum and Brancato suggests a much better reason why their statement that the defendants were at Pine Lake Lodge from 1 to 2 :30 was not believed by the jury. While the jury had a right to believe it, this testimony contains elements which would put a serious strain on the credulity of any reasonable person.

The first charge of misconduct is that on the *voir dire* examination of the jurors the district attorney, in effect, told them that both defendants had been previously convicted of felonies. The matter was first brought up by defense counsel, who asked a juror whether he would keep himself free from prejudice by reason of the fact "that there has been a conviction heretofore of one of the defendants." The district attorney interrupted and asked counsel to state to which defendant he referred. Thereafter, the district attorney started to ask a juror the same question saying, "I don't know which one, counsel refuses to divulge the one." The remarks of the district attorney in each of these instances were assigned as misconduct and the court instructed the jury to disregard them. No attempt was made to tell the jury that both defendants had been convicted of felonies, the matter was first brought up by defense counsel, and this was done in a manner which rather suggested that only one of them had been so convicted. While perhaps unnecessary, the district attorney's remarks were harmless and the jury was instructed to disregard them.

It is next contended that misconduct appears in the cross-examination of the defendant Brancato with respect to his previous convictions since he had already admitted them. Defense counsel had brought out from this witness that he had suffered three convictions, what they were for, and when the last one occurred. On cross-examination, the district attorney asked a number of questions as to when each conviction had occurred and what they were for. Finally, defense counsel stated: "I have not objected before. I think he is overdoing it." The court remarked that the examination had gone far enough and sustained the objection. No request was made to strike the testimony or that an admonition be

given. It neither appears that the examination went beyond permissible matters nor that any prejudice could have resulted (*People* v. *Jacobs,* 73 Cal.App. 334 [238 P. 770]; *People* v. *Sheridan,* 136 Cal.App. 675 [29 P.2d 464].)

The next charge of misconduct is too trivial and unsubstantial to require comment.

■ Misconduct is assigned in connection with the court's examination of defendants' witness, Tommy Davis, and in the direct examination of a prosecution witness, Virginia Moncrief. It is argued that the district attorney, in cross-examining Davis, inferred that defendants' counsel had paid the witness for his testimony, by asking Davis whether he had told Mr. Cunningham and Virginia Moncrief that Mr. Peckinpah had given him $20; that Mr. Cunningham was not then called as a witness; and that when Virginia Moncrief was on the stand the corresponding question was not asked of her until forced by defendants' counsel.

Virginia Moncrief was called in an attempt to impeach the testimony given by Tommy Davis. She testified that on July 8, she had a conversation with Davis with reference to this case and that Davis told her: that he had recently taken a trip to Los Angeles, staying at the best hotels which had cost him nothing; that the cafe did not pay his $20 back and "I am going to get on the side that is giving me my money"; and that "If there was enough money involved that, to him, faces could change a lot in four months." During her testimony defense counsel asked the district attorney if he was not going to question the witness as to what was said about his paying the witness. The district attorney said that he did not intend to imply that counsel had paid any witness, that he did not believe that he had, but that he believed that the witness Davis had so stated and wanted to show that he was not telling the truth. In response to the district attorney's question the witness then stated that Davis had told her that he had been in counsel's office but did not tell her that he received $20 there. Defense counsel then asked the district attorney to explain why he had asked such a question. The district attorney gave his explanation of what he had attempted to do, stating that he had acted in good faith and that he had not intended to imply anything against counsel. The judge then cautioned both attorneys, stated that he thought both had acted in good faith and suggested that the matter be dropped, which was done. There is nothing to in-

dicate intentional misconduct, and we are unable to see either prejudice or reversible error in this incident.

It is next contended that the district attorney injected his personal opinion by attacking the credibility of the alibi witness Blum, and by stating facts not in evidence. While arguing on the effect of the alibi evidence the district attorney said ''This good, substantial citizen that we have. I don't know what happened out there but I wouldn't take Goody Blum's word for it.'' A little later he said: ''And where do you think they split up the loot? Out at Goody's. Out there at Goody Blum's. That is where they were, that is where they took off from.'' These statements were made in an argument in which the district attorney pointed out from the evidence good reasons why he would not take Blum's word for what occurred. The latter statement was really a question with the suggested answer that the evidence indicated the loot was divided out there. Two witnesses had testified that the defendants were at Blum's place about 2:30 a. m. and the district attorney was arguing that they must have divided the loot there, got rid of the jewelry, put one revolver in a suitcase, and removed the two-tone jacket and put it in the car. This was a legitimate argument and, when taken with the context, no expression of personal opinion or statement of facts outside of the evidence appears to have been made. Moreover, no assignment of misconduct or request that the jury be admonished to disregard the statements were made.

The final assignment of misconduct is that the district attorney appealed to the passion and prejudice of the jury in his closing argument. In various places in his argument the district attorney made the following remarks:

''This defendant, or defendants, who did it were gamblers themselves, bookies; and so the stripes on the defendants here are not to be confused by anything that counsel may say about other people.''

''These gangsters come down here and hold up places, they think this is a cow town and that these hicks around Fresno cannot catch up with them but they are not silly enough to run around with cigarette lighters and rings and fountain pens in their pockets.''

''He said you couldn't break a dog of sucking eggs. Neither can you break an ex-convict from sucking eggs, don't forget that.''

". . . and we were perfectly satisfied that you are twelve good citizens of Fresno County that won't stand the kind of gangsters that we are getting into Fresno County; and Fresno County is a place to live. . . . I think it should be a decent place to live. We don't need Hollywood and Denver gangsters in here to help us."

"I want you to decide as members of the jury and as a representative group of the people of Fresno County and of the City of Fresno as to whether or not you are going to allow this type of gangsters to come in here to Fresno County and flaunt the laws and hold up people, I don't care who they are. That is the question you have to decide and when you have decided that in your own mind and satisfied your own consciences that you are doing the right thing don't hesitate to do it because it's you, ladies and gentlemen of the jury, that will finally determine whether Fresno County is to be a clean place to live or whether we are going to import from Denver, Hollywood, Los Angeles and Chicago the lousy kind of gangsters that they have in the country."

The first remark was intended merely to caution the jury not to be confused because the victims of the robbery were engaged in gambling. The reference to "sucking eggs" and "an ex-convict" was in reply to an illustration made by defense counsel, and they had themselves brought out the fact that one of the defendants was an ex-convict. Neither misconduct nor prejudice appears with respect to these remarks.

The other remarks, in referring to the defendants as gangsters, to gangsters in general, and to protecting Fresno County as a place in which to live, were unnecessary and ill-advised. While this must be conceded, it does not necessarily follow that the remarks were sufficiently prejudicial, under the circumstances here appearing, to justify a reversal. As has been frequently remarked, it is difficult to understand why district attorneys persist in making remarks of this kind in spite of frequent cautioning, and even rebukes, of the reviewing courts. However, the real issue is as to whether the remarks made have prevented the defendants from having a fair trial, and not as to whether the district attorney deserves to be punished by setting aside the conviction.

Conceding that these remarks should not have been made there was evidence that these defendants had been in Fresno less than two days; that they had known each other for two years and had been together in Denver and other places;

that one was a professional gambler; that one was an ex-convict; and that while jewelry and other personal property were taken from victims of the robbery such articles were not found on the defendants an hour or two later. The word "gangster" is a comparatively new word, not appearing in the older dictionaries. The more recent editions of Webster define it as "A member of a gang of roughs, thieves or the like." The evidence indicates that the persons who committed this robbery came fairly close to fitting the description contained in this definition. While a reference to gangsters in general was made the appeal made to the jury was to not allow persons of this type to come in and flaunt the laws and hold up people. While the jury was, in effect, told that a responsibility rested on them in keeping Fresno County a clean place in which to live they were urged to act only in the event they were fully satisfied that a conviction was the right thing.

While in no way approving the particular remarks here made, we are far from convinced that any miscarriage of justice occurred or that these remarks prevented the defendants from having a fair trial. Under the evidence shown by this record it cannot reasonably be supposed that the result would have been different had the defendants been referred to as "gentlemen" instead of gangsters, or that the reference to gangsters in general or the protection of Fresno County had any influence or effect in causing the jury to disbelieve the defendants' alibi evidence. It would be unreasonable to assume that the jury might have believed the alibi evidence had they not been affected by passion and prejudice. The jury was instructed three times that it must be governed solely by the evidence and the law, and that it must not be influenced by passion or prejudice. Moreover, these remarks were not assigned at the time as misconduct and no request was made that the jury be instructed to disregard them.

██ The final contention, and the only one aside from misconduct, is that the court erred in submitting verdict forms providing "only for the guilt of the defendants," and that the verdict as accepted did not represent the true verdict of all the jurors.

At the conclusion of his instructions the court instructed the jury that each defendant might be found guilty of robbery in the first degree, or guilty of robbery in the second degree, or not guilty. He then ordered the clerk to hand the

jury forms of verdict which had been prepared. This was done and there is nothing in the record to indicate that the forms given the jury were not those described by the judge.

The case was given the jury at 3:44 p. m. At 5:44 p. m. they reported that they were unable to agree and were again sent out. At 10:22 p. m. they returned and the foreman announced that they had agreed upon "a verdict." The court ordered "the verdict" handed to the clerk. The clerk then read two verdicts, one finding Pedrotti guilty of robbery in the first degree and one finding Brancato guilty of robbery in the first degree. The clerk then asked "Is that your verdict" and the jurors responded in the affirmative. The jury was then polled at the request of defense counsel. Each juror responded that this was his or her verdict with the exception of the eleventh juror, who replied: "Please, I would rather not answer that question." The court asked her what she had said and she replied: "I don't like to answer that question." The court then told the jury to retire for further deliberation.

The jury returned in 20 minutes and the foreman announced that it had agreed upon a verdict. The clerk then read a verdict which was one finding Pedrotti guilty of robbery in the first degree. The clerk then asked the jurors if that was their verdict, and all responded in the affirmative. Defendants' counsel then inquired whether this was the same verdict which had been previously signed by the foreman. The jurors responded in the affirmative, and the foreman said: "That is the same one. We took another vote." Defendants' counsel then objected on the ground that the verdict had not been signed since the vote was taken. After the court inquired as to just what was objected to defense counsel, in effect, withdrew the objection. The court then replied that if anything was wrong he wanted it corrected at that time, and stated that he would ask the clerk to prepare new "verdicts" and let the jury go out and "sign it" if they agreed upon it. He then asked if there would be any objection "to just simply cut off the bottom of those sheets and put the date on and let them take them." Defense counsel said there would be no objection to this and the court ordered this done. The clerk's minutes show that the parties stipulated that the lower portion of the form of the verdict containing the signature of the foreman and the date might be removed by the clerk and another date and the word "Foreman" inserted. This

was done, the changed forms were handed to the jury, which was again sent out at 10:50 p. m. The jury returned at 11 p. m. and announced that it had agreed upon verdicts. They were handed to the clerk who read the two verdicts, one finding Pedrotti guilty and the other finding Brancato guilty, as before. After reading each of these verdicts the clerk asked the jurors if that was their verdict and the jurors responded in the affirmative. The court then asked if it was desired to have the jury polled and defense counsel requested that this be done. Each juror was then asked "Is that your verdict?" and each juror, including the eleventh juror, responded "Yes" or "It is." Defense counsel then asked permission to interrogate juror No. 11 as to whether this was her true verdict, and permission was refused. Defense counsel then asked that the jury be polled again, which request was refused. The verdicts were then recorded, after which the clerk again read each verdict and after each was read asked the jurors "Is that your verdict?" and in each instance the jurors responded in the affirmative.

There is no merit to the contention that the court failed to submit forms of verdict other than those of guilty. The jury had also been given "not guilty" forms and the subsequent proceedings involved only the furnishing of new forms for guilty verdicts, which was done in a way consented to by the defendants. There is no question that the matter was fully understood by everyone and the "not guilty" forms originally furnished were never withdrawn from the consideration of the jury.

While the eleventh juror first made an equivocal reply, after having once agreed to the verdict, the jury was sent out twice subsequently and her approval of the verdict was then expressed several times. No error appears in refusing to permit defense counsel to attempt to impeach this juror's verdict as already returned and several times confirmed in open court.

The judgment and order are affirmed.

Griffin, J., concurred.

Appellants' petition for a hearing by the Supreme Court was denied March 18, 1948.