[Crim. No. 4474. Second Dist., Div. One. Jan. 11, 1951.]

THE PEOPLE, Respondent, v. GORDON K. DARCY, Appellant.

Eugene V. McPherson for Appellant.

Fred N. Howser, Attorney General, and Norman H. Sokolow, Deputy Attorney General, for Respondent.

DRAPEAU, J.—George Speropoulos was an old man. He owned the Belmont restaurant in San Pedro. It was a small restaurant, with a bar along one side of the room, and a few open booths opposite the bar.

Mr. Speropoulos did most of the work himself. He cooked at one end of the bar; he waited on customers, and served them beer or wine if ordered. Occasionally, when business was good, he hired waitresses to help him.

About midnight of July 11, 1949 he was working alone. Three ladies came in. Mr. Speropoulos had invited them to a chicken dinner which he planned to cook at that time. The ladies seated themselves on stools at the bar. Also at the bar was an old friend of Mr. Speropoulos, Arnfin Simonsen, and a Mexican.

A little after 12 the defendant and a companion named Henry Thwaits staged a holdup. They had guns—automatics—in their hands. In fact, during all the time they were in the restaurant the men held their guns in their hands.

Thwaits was at the bar; defendant was at the foot of a flight of stairs leading to an upstairs office room. Defendant had a handkerchief tied over part of his face. Thwaits was a big man, about 6 feet tall, weighing about 200 pounds; defendant was smaller.

Thwaits made Mr. Speropoulos, Mr. Simonsen, and the Mexican lie face down on the floor. Then he herded them into the men's restroom. He told them, "If you don't do what I tell you to do I'll kill you." The door of the restroom opened into the restaurant room. Thwaits struck all three men on the head with the barrel of his gun, with such force as to draw quantities of blood.

Defendant, still standing on the stair landing, told the ladies to go into the men's restroom too.

"We can't go in there," said one of the ladies; "that's the men's room."

"Get in there, you dope," said the other lady, "this is a stick-up."

"That's right, ladies," said the defendant, "get in there."

The third lady had gone to the ladies' room, and was not seen during the action which followed.

Thwaits went into the restroom with the men and women, and told them to keep their faces to the wall. Defendant came to the door of the restroom and said to Thwaits, "There is no money upstairs."

Thwaits said to Mr. Speropoulos, "Come with me." He took the old man upstairs, bleeding from the wound on his head. Defendant remained in the restroom, guarding the people there.

Upstairs Thwaits three times told Mr. Speropoulos, "Listen, I know you have got some money here. If you don't give me the money I am going to kill you." The third time he violently threw the old man against a davenport, so that his glasses flew off. Shoving the muzzle of his automatic against the old man's chest Thwaits said, "Say yes or no." Mr. Speropoulos gave him $800 which he had hidden behind his mother's picture. Still holding the gun on him, Thwaits brought him back to the restroom.

Other money was taken from the person of Mr. Speropoulos, and from his cash register. Money was taken from the person of Mr. Simonsen. Purses with money, checks, and odds and ends peculiar to women, were taken from the two ladies.

When Mr. Speropoulos was brought back to the restroom, Mr. Simonsen looked around, and Thwaits again hit Mr. Simonsen with his pistol barrel, again drawing blood in copious quantities.

The two robbers left with the loot. A few minutes later the ladies and the men cautiously came out from the restroom.

Leaving the restaurant, the two robbers started running. Each of them had his car parked nearby.

Then fate took a hand. A preacher was passing by in an automobile. He saw two men running, one tall and heavy set, the other shorter and slighter. The smaller man had a ladies purse with its straps dangling from his hands. The preacher saw an automobile start with its lights off, followed it, took its number, went to the San Pedro police station, and gave the police the license number.

An all-units radio alarm was immediately broadcast to radio cars in the vicinity. One of these radio cars saw an automobile, going about 25 miles an hour. Following closely behind it, check was made by radio with the police department, to make sure of the wanted number. It was. The car belonged to defendant, and the license number was his license number.

The officers in the radio car turned on the red light and siren. Instead of stopping, defendant started off at about 70 miles an hour, followed by the radio car. In turning a corner, another radio car, joining in the chase, cut in ahead

of the first radio car. And so the three cars went careening through the night, one behind the other.

A police officer in the radio car closest to defendant's car shot at it twice with a shotgun loaded with buckshot. The car swerved off the street, across lawns, and struck the front porch of a house. Defendant emerged, ran between two houses, hid himself in a lath-house in a backyard, and was finally captured by other patrolmen. He landed in jail between 12:45 and 1 a. m.

Later, other officers, following the path of the fleeing car, found in the street a purse taken from one of the women in the restaurant. Between the two houses where the defendant fled, ten $5.00 bills and twenty $1.00 bills were found. On the lawn in front of the house was a $1.00 bill.

Defendant was searched at the police station, and the officers found in his possession a roll of 5-cent pieces wrapped in paper. Such a roll of nickels had been taken from the restaurant. Talking with police officers afterwards, defendant said that he wished Thwaits would be picked up, that he did not want "to ride this beef alone."

Every one of the victims—the restaurant man, his friend, and the two women—identified the defendant as one of the men who robbed them.

Defendant was charged with one count of kidnapping with violence, four counts of robbery, and three prior felony convictions. He admitted the prior convictions, and was convicted on all five counts, as charged. The jury determined the punishment for kidnapping to be life imprisonment without parole, and each of the robbery counts to be of the first degree. On the kidnapping count defendant was sentenced to the penitentiary for life, without possibility of parole. On each of the robbery counts he was sentenced for the term prescribed by law. All counts to run concurrently.

From these judgments he appeals.

Defendant urges: (a) that the evidence is insufficient to support the convictions; (b) error in admission of evidence; (c) error in instructions given; and (d) that sentences were imposed for kidnapping and for robbery, whereas but one criminal offense was committed, for which but one sentence could have been imposed. These will be considered in order.

■ The objection that the evidence is insufficient may be summarily disposed of. The record has been read, and supports beyond all reasonable doubt the findings of the jury.

Defendant took the witness stand; denied having any part in the crimes; said that he was driving his automobile when he saw Thwaits, who hailed him and got in his car; that he drank whiskey which Thwaits gave him, on top of beer which he had been drinking; that Thwaits suggested they rob a place and that he declined to have any part in it; that he became sick from the liquor he had consumed; that two men got into the rear seat of the car, and something was said about holding up an old man in San Pedro; that at that time he passed out "from the effect of the liquor or something"; and that he knew nothing more until his automobile crashed and he ran from it and hid in a chicken coop.

■ It is elementary law that it was the function of the jury to believe or to disbelieve defendant's testimony; it was their sole province in the domain of questionable facts to declare the truth. By their verdicts they found the truth of the People's case. This court is in complete accord with that finding. The only thing that may possibly be said for defendant is that Thwaits wielded the gun in the assaults upon the two men, and brutally manhandled the old man in the upstairs room.

At the close of direct examination of defendant, counsel for the People read to the jury records of three prior convictions which defendant admitted he had suffered. This was for impeachment under section 2051, Code of Civil Procedure. One of these records showed that defendant was on parole at the time of the commission of the crimes charged.

The documents consisted of (1) the certification of Clinton T. Duffy, Warden of San Quentin Prison, as to his official position, that he has in his custody records pertaining to defendant, when defendant was received at San Quentin, under commitment from what court and for what offenses, the date his terms were fixed and what they were, the date he was paroled and discharged from parole, that the copies of the commitment and fingerprints attached are true and correct copies of originals in his custody; (2) fingerprint card with defendant's signature; (3) photograph of defendant under prison number; (4) copy of judgment in Superior Court action number 70634, Los Angeles County; (5) copy of judgment in same case, another count; (6) copy of judgment in same case, another count; (7) copy of judgment in Superior Court action number 73421 before same judge; (8) the certification of Richard A. McGee, Director of the Department of Corrections, as to his official position, that he

has in his custody records pertaining to defendant, when defendant was received at San Quentin, under commitment from what court, for what offense, the date his term was fixed and for how long, the date he was released on parole, that the copies of the commitment and fingerprints attached are true and correct copies of originals in his custody; (9) copy of judgment in a Santa Clara Superior Court proceeding; (10) order to sheriff to take prisoner; (11) fingerprint card bearing defendant's signature; (12) photograph bearing prison number.

Objection was made and overruled, that the foregoing records from San Quentin and Folsom were indecipherable; but no objection was made to this method of procedure, and no motion to strike was made. The district attorney did not read all of the documents, but from parts only of some of them.

When a defendant in a criminal case offers himself as a witness he may be impeached on cross-examination by asking him if he has been convicted of a felony, or by showing the fact, if it exists, by *the record of the judgment*. (Italics added.) (Code Civ. Proc., § 2051; *People* v. *Williams*, 27 Cal.2d 220 [163 P.2d 692]; *People* v. *Peete*, 28 Cal.2d 306 [169 P.2d 924]; *People* v. *Craig*, 196 Cal. 19 [235 P. 721]; *People* v. *Sears*, 119 Cal. 267 [51 P. 325]; *People* v. *Brancato*, 83 Cal.App.2d 734 [189 P.2d 504].) But beyond this the examination should not go. (*People* v. *Chin Hane*, 108 Cal. 597 [41 P. 697].)

There should be no difficulty about what the code means when it says the "record of the judgment." Defendant's record in the penitentiary, his prison photographs and fingerprints, should not have been read to the jury. However, after examination of the entire case this court is not of the opinion that the error resulted in a miscarriage of justice. (Const., art. VI, § 4½.)

It is true that from a reading of the entire record in this case we are unable to say that the errors just set forth may have turned the scale in favor of the prosecution, because the evidence of appellant's guilt was overwhelming. Therefore, it must be held that, in spite of palpable error in the admission of the criticized portion of appellant's criminal record, there was no miscarriage of justice.

However, we cannot refrain from administering a deserved rebuke for the offer of and receipt in evidence of appellant's record in the penitentiary, his prison photographs and fingerprints. It would be an impeachment of the legal learning

of counsel for the People to intimate that he did not know the introduction of the just mentioned records to be improper, wholly unjustifiable, and peculiarly calculated to prejudice the substantial rights of appellant. Such conduct tends only to prevent the accused from having that fair and impartial trial to which, whether innocent or guilty, he is entitled. Moreover, it may defeat the punishment of crime by jeopardizing a conviction when a defendant is clearly guilty. It is obvious that the questioned portions of appellant's prison record were injected into the case for the manifest purpose of prejudicing the jury against him. It is only because we are unable to say that the conviction herein might have resulted from the foregoing disregard of appellant's essential rights, that we are not compelled to reverse the judgments.

Pertinent indeed to the situation with which we are here confronted are the remarks of the court in *People* v. *Black,* 73 Cal.App. 13, 43 [238 P. 374], wherein it was said:

". . . we feel impelled to direct the attention of district attorneys and trial judges to the frequent occasion which is thrust upon us to save judgments of conviction by means of the provisions of section 4½ of article VI of the constitution. It seems evident that the prosecutors of the state, and possible that the trial judges, are conducting criminal cases with an eye to the saving grace of the section. It should be manifest that such a course is improper. In the performance of their respective duties incident to trials, the existence of the section is of no concern to those officers. That part of the organic law of the state is of interest, so far as its application is concerned, if we except proceedings on motion for a new trial (see *People* v. *Tomsky,* 20 Cal.App. 682 [130 P. 184]), only to the courts of review. District attorneys and trial judges should conduct the trial of criminal cases exactly as if the section did not exist. Such a course, if faithfully and diligently pursued, will lessen the number of appeals, will shorten the time necessary for the consideration of appeals which are taken, will lessen the number of retrials by superior courts, and will conduce to the general dispatch of business in both trial and appellate courts."

The trial judge instructed the jury relative to the crime of kidnapping with violence and the punishment therefor, generally following the language of the code. Defendant complains of the following language in one of these instructions: "To strike another person in the head with a revolver or pistol in a hostile and intentional manner, with sufficient force

to lacerate the scalp, causing bleeding therefrom, is the infliction of bodily harm as herein defined.'' Defendant asserts that this was an instruction as to facts and an invasion of the province of the jury.

The language complained of was an abstract statement of fact, and was not objectionable. (*People* v. *Flannelly*, 128 Cal. 83 [60 P. 670] ; 8 Cal.Jur. 298.)

Finally we come to defendant's last specification of error : that he was sentenced for three crimes instead of one.

The recent case of *People* v. *Knowles*, 35 Cal.2d 175 [217 P.2d 1], would indicate that in this respect defendant is right. The judgment for kidnapping the restaurant man and his friend should be affirmed; the judgments for robbery of them should be reversed. The judgments for robbery of the two women should stand. (See cases collected in *People* v. *Knowles, supra.*)

In passing, it may be said that the evidence in this case of the crime of kidnapping denounced in Penal Code, section 209, and of the asportation, is stronger than in the Knowles case. In this case it may be inferred that defendant and his companion knew of the money in the upstairs office, and agreed before entering the restaurant to take the old man upstairs, and to torture him, as Thwaits did. These facts to some extent resemble the facts in *People* v. *Tanner*, 3 Cal.2d 279 [44 P.2d 324].

The judgment imposed upon the defendant for kidnapping for the purpose of robbery, while armed, and with violence, as charged in Count 1 of the information, defendant to be punished by imprisonment in the state prison for the term of his natural life, without possibility of parole, is affirmed; the judgment of conviction for robbery of George B. Speropoulos, as charged in Count 2 of the information, is reversed; the judgment of conviction for robbery of Ada M. Fox, as charged in Count 3 of the information, is affirmed; the judgment of conviction for robbery of Mary Bigler, as charged in Count 4 of the information, is affirmed; and the judgment of conviction for robbery of Arnfin Simonsen, as charged in Count 5 of the information, is reversed.

White, P. J., and Doran, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied February 8, 1951. Edmonds, J., and Carter, J., voted for a hearing.