[Crim. No. 1352. Fourth Dist. May 28, 1958.]

THE PEOPLE, Respondent, v. JACK TAYLOR O'FARRELL, Appellant.

Enright, Von Kalinowski & Levitt and William B. Enright for Appellant.

Edmund G. Brown, Attorney General, and Morris Schachter, Deputy Attorney General, for Respondent.

GRIFFIN, J.—Defendant-appellant was charged in count 1 of an information with armed robbery of one George Parrocha (violation of Pen. Code, §§ 211, 211a) on the night of December 25, 1956; in count 2 with the crime of burglary while armed with a deadly weapon (violation of Pen. Code, §§ 459-460); in counts 3 and 4, kidnaping Fred C. Paul and George Parrocha for the purpose of robbery (violation of Pen. Code, § 209); and in count 5 with armed robbery of $723.15, property of the La Jolla Beach and Tennis Club, taken from the person and possession and immediate presence of its employees therein named. He was further charged with five prior felony convictions and that he served terms therefor in a state's prison. He pleaded not guilty to the charges and admitted the prior conviction. A jury trial resulted in a conviction on all counts as charged. After a new trial was denied he was sentenced to prison on counts 1 and 4 to run concurrently and on counts 3 and 5 to run concurrently, but consecutively with counts 1 and 4, and count 2 to run concurrently with counts 3 and 5.

On Christmas Eve, about midnight, the bartender of the La Jolla Beach and Tennis Club placed about $700 in a bag and deposited it in the company's safe located in a room near the bar. About that time one Denton, a janitor on night duty, arrived and checked the various rooms and found everything in order. He then lay down in the employees' ladies rest room located near the kitchen, just off from the main dining room. He was later awakened by three men. One had a gun and they ordered him to turn over. They tied his hands and demanded information as to the location of the safe. He told them. About that time the telephone rang and they ordered Denton to answer it. It was the night watchman in the club portion of the building calling. After telling Denton what to say, he was taken back to the rest room, retied, and defendant who had an automatic caliber pistol, remained with him while the other two, one of whom had a crowbar, located the safe. Later, the chief cook, Parrocha, arrived by the back door entrance and tried to enter the door but found it locked. He started calling to Denton. Defendant again released Den-

ton and he was told to go and open the door to the kitchen. As he did so, Parrocha, who had gone back upstairs, came down, and as he entered the door, defendant held an object at his back and told him to go straight through the kitchen, down the hall, and into the ladies rest room. He did so and when he arrived his feet and hands were tied. His wallet, containing about $20, was taken from him. One Paul, the pantryman, came to work shortly after this. He was unable to gain entrance to the kitchen. He went back upstairs and someone called to him to come back. He did so and as he approached the door a man wearing a silk stocking mask pulled a gun and ordered him to go to the ladies' rest room with the others. He was tied and searched but he had no money with him. Later, one Dursley, maintenance man, arrived and saw a Mrs. Perkins, the maid, dusting the piano in the dining room. About that time defendant arrived on the scene with a silk stocking mask over his head and with a gun in his hand, ordered her to go to the rest room. She thought he was joking and told him so. He then told her it was ''no monkey business'' and she followed orders. Dursley went ahead and saw the others tied and lying on the floor of the rest room. He then realized it was a holdup. They were likewise tied up. All three robbers were wearing white waiters uniform coats which they found there, and all were masked with silk stockings. A light banging noise was heard (banging on the safe in the near-by room). This continued for some time. Before the three robbers left they stacked a table against the rest-room door, and the sound of a sudden departing automobile was heard. The employees later gained their freedom and reported the robbery. The manager made an investigation and found one of the windows, which ordinarily was left locked, had been opened and the screen had been taken off. The door to the room where the safe was located was damaged. The safe had been ripped open and about $720, kept in a locked cloth money bag, and certain Christmas money for the employees, consisting of dollar bills in envelopes, was missing. About June 9, 1957, defendant was apprehended and placed in a lineup at the jail with other prisoners. They were required to make certain audible statements within the hearing of these several employees. After a request to have defendant speak in a louder tone the maid, Mrs. Perkins, said she identified the voice of defendant as being the person who held the gun on her and demanded she leave the dining room and go through the kitchen into the rest room with the others, where

he tied her up; and that he was the one who did most of the talking. She also said the build of defendant, as she observed him in the courtroom, was pretty much similar; that she could see "pretty clearly" his features, through the silk stocking, and that he had no scars or distinguishing features on his face; that she was not sure as to whether he wore a slight mustache or was clean shaven; that she never before heard a voice like his and she was "certain" of it; that he was wearing a black hat, khaki trousers and a white waiter's jacket; that she recognized his voice in the lineup and selected his photograph from others as being the attacker; that she was certain in her mind of her identification of him and there was "no doubt"; and that had she not recognized his voice she would not say she otherwise recognized him. Other employees would not testify that they recognized any of the voices in the lineup as being that of any one of the three robbers. They did testify generally as to the particulars above described but failed to identify defendant or his voice. They said he was masked and they were too nervous to remember much about it; that it was too dark in the ladies rest room to see and they were required to lie face downward.

At the trial, one of the robbers, Albert Davis, who was then serving time in Chino for another offense, testified for the prosecution after stating that the officers had agreed not to prosecute him on this charge. He definitely testified that he, defendant O'Farrell, and one Bert Frilot, who lived in Santa Monica, decided that evening to rob some place; that they proceeded to La Jolla and arrived there after midnight; that they had one gun between them, a drill and a bar; that between 3 and 4 a. m. they entered the beach club from a back window and while looking for the safe found the watchman asleep in the rest room on a lounge; that they tied him up and started looking for the safe; that defendant, with the 38 automatic pistol "stood point" watching over him; that while they were drilling the safe the telephone rang and they took the watchman to the telephone and told him what to say; that they returned him and tied him up again; that sometime later they heard a noise from the keys of the piano (the maid dusting), and O'Farrell brought in the maid and another man and tied them up; that another employee or two knocked at the kitchen door and the watchman was untied and let one of them in; that they were taken to the rest room and tied up and one was searched and he had no money; that they took about $600, which was con-

tained in a cloth money bag, from the safe, and certain envelopes containing Christmas money; that they all wore waiters' jackets, silk stocking masks, and garden gloves, and that they had a crowbar and a drill; that O'Farrell gave most of the orders to the employees; that the other robber, Frilot, was, at the time of trial, in custody on a federal charge in Georgia; that after the robbery, which took two or three hours, they pushed a table in front of the door, took off their waiters' coats, and left in their car by way of Warner's Springs and stayed there until dusk; that while in the car they divided the money which had been contained in the cloth money bag and in the envelopes. Defendant failed to take the witness stand and offered no evidence at the trial.

■ Defendant concedes that identification can be made on the basis of voice recognition, but claims that, as a matter of law, there was no sufficient credible evidence of voice recognition which would corroborate the testimony of the accomplice Albert Davis. In this connection it is argued that different words were used by the defendant in the lineup from those used by the assailant and no proper comparison could be made; that Mrs. Perkins' testimony as to defendant's voice was equivocal, and since the other employees could not identify his voice little credence should be placed on the maid's testimony in this respect. It clearly appears that the employees who testified in respect to the details of the robbery fully corroborated the testimony of the accomplice in every respect except the possible identification of the defendant. From his testimony, which was related in similar detail, it affirmatively appears that defendant was present on that occasion. The maid was quite positive of defendant's identification from his voice and his build. The question of the weight to be given her testimony was for the jury to determine. (*People* v. *Waller*, 14 Cal.2d 693, 700 [96 P.2d 344]; *People* v. *Knowles*, 35 Cal.2d 175 [217 P.2d 1].) The jury decided adversely to defendant's contention. It cannot be said that the corroborative evidence was insufficient, as a matter of law. (*People* v. *Trujillo*, 32 Cal.2d 105, 110 [194 P.2d 681]; *People* v. *Wilson*, 25 Cal.2d 341, 347 [153 P.2d 720]; *People* v. *Williams*, 101 Cal.App.2d 624, 628 [226 P.2d 9]; *People* v. *Kittrelle*, 102 Cal.App.2d 149, 154 [227 P. 2d 38].)

■ The next claim is that the court erred in its ruling in respect to certain evidence and in denying a mistrial. During the cross-examination of the people's witness, Davis, the

alleged accomplice, a question arose as to how many prior felony convictions he had suffered and as to how long Davis had known defendant O'Farrell. He stated he had known him intimately for about two months previous to the robbery but he believed he "had seen him before . . . prior to that in San Quentin — (he wasn't sure) — I didn't know him there — though." Counsel for defendant moved to strike the answer. It was denied at the time but subsequently, upon counsel's statement that he did not believe defendant was going to testify, the trial court, at defendant's request, granted the motion to strike and the jury was instructed to disregard it. The motion for mistrial then made was denied. The answer was, to some extent, elicited by counsel for defendant. It appears that there was no bad faith on the part of the prosecution, the court, or the witness in answering the question. (*People* v. *Willmurth*, 77 Cal.App.2d 605 [176 P.2d 102].) When the court's attention was called to its probable effect, if the defendant failed to testify, it immediately ordered it stricken and told the jury to disregard it. We must assume the jury followed the instruction. (*People* v. *Darnel*, 28 Cal. App.2d 122, 127 [82 P.2d 209].) It does not affirmatively appear that prejudicial error resulted or that the granting of a mistrial was mandatory.

■ Stress is laid upon the claim that the district attorney committed prejudicial misconduct during the course of the argument before the jury. It appears from the record that before counsel for defendant completed his argument, he referred to the failure of defendant to take the stand and told the jury that the defendant did not do so on his own initiative; that if there was any blame to be assessed he, counsel for defendant, should be blamed and not the defendant; that he believed there was no legal evidence presented to the prosecution to sustain a conviction and if he was wrong he was the one who should be penalized. Thereafter the prosecutor commented on defendant's counsel's impassioned plea which he said was made in a forceful "emotion-packed voice" and then remarked: "Now, there is something of a saying amongst defense attorneys that probably is said in jest: 'For a reasonable fee, I will give you a reasonable doubt.'" Defendant's counsel assigned the statement as misconduct and unfair to him, the profession and the defendant. While it may well appear the remark was made in jest, it would have been much better unsaid. Since the court properly ordered the jury to

disregard it and considered the question of a mistrial on a motion for new trial and denied it, we conclude that no prejudicial error resulted. (*People* v. *Kersey,* 154 Cal.App. 2d 364, 367 [316 P.2d 52]; *People* v. *Britton,* 6 Cal.2d 10, 13 [56 P.2d 491]; *People* v. *Revenko,* 93 Cal.App. 650, 653 [269 P. 980].)

Claim is next made that the evidence is insufficient to show kidnaping for the purpose of robbery under section 209 of the Penal Code, as amended in 1951 (Stats. 1951, vol. 2, chap. 1749, p. 4167, § 1) which provides that any person who kidnaps or carries away any individual to commit robbery is guilty of a felony. Defendant cites *People* v. *Taylor,* 135 Cal.App.2d 201 [286 P.2d 952]; *People* v. *Cluchey,* 142 Cal. App.2d 563 [298 P.2d 633]; and the dissenting opinion in *People* v. *Knowles,* 35 Cal.2d 175 [217 P.2d 1], as authority for his conclusion that, from the facts here related, no active kidnaping is shown other than that necessarily incident to the commission of robbery, and accordingly only a robbery was committed and defendant should not be punished for both crimes.

The pivotal question here is whether there was sufficient evidence to show that there was a kidnaping for the purpose of robbery that could be a separate and distinct offense. The cases decided since the 1951 amendment have not indicated an exact limitation as to the distance the victim would be required to travel before it would constitute kidnaping for the purpose of robbery. They have held that the mere detention of the victim during the commission of a robbery was not sufficient. (*People* v. *Cluchey, supra.*) It was held in *People* v. *Chessman,* 38 Cal.2d 166 [238 P.2d 1001], for acts committed prior to 1951, that punishing the defendant separately for the violation of section 209 of the Penal Code (kidnaping) and for the robberies and sex crimes which, under the circumstances of that case were essential parts of those violations, would amount to double punishment which is forbidden by section 654 of the Penal Code. (See also *People* v. *Randazzo,* 132 Cal.App.2d 20 [281 P.2d 289]; and discussion in *People* v. *Randazzo,* 48 Cal.2d 484 [310 P.2d 413].)

It has been definitely held that the commission of a kidnaping for the purpose of robbery is separate and distinct from the crime of robbery which is the object of kidnaping. (*People* v. *Lombard,* 131 Cal.App. 525 [21 P.2d 955].) A defendant may be properly convicted of both charges though the robbery is the same as that which the defendant is charged

with having intended to commit in perpetrating the kidnaping, provided the robbery was not so inseparable from the kidnaping that it and the kidnaping constituted a single indivisible act. (*People* v. *Knowles*, 35 Cal.2d 175 [217 P.2d 1]; 29 Cal. Jur.2d 659, § 2.) ■ It has likewise been held that though two victims respond to the same force, such as being ordered about at gun point, and are simultaneously subjected to the same indignities, there are nevertheless two kidnaping offenses. (*People* v. *Johnston*, 140 Cal.App. 729 [35 P.2d 1074].) Although these cases were decided prior to the amendment of section 209 in 1951, these same principles are applicable to that section as amended, and are still valid precedents. (29 Cal.Jur.2d 666, § 11, and cases cited.) In the early common law, kidnaping consisted of the forcible abduction or stealing away of a person from his own country and carrying him into another; but this definition has long since become obsolete. Many of the acts now punishable as kidnaping differ as widely from acts that anciently constituted that offense as the social and economic conditions that gave rise to the necessity for enacting penal statutes to protect against dangers peculiar to the times differ from each other. Kidnaping that is subject to a maximum penalty of 25 years is referred to as "simple kidnaping," whereas kidnaping carrying a more severe penalty is called "aggravated kidnaping." A person is guilty of simple kidnaping if he forcibly steals, takes or arrests any person in this state and carries him out of the county or to any part of the same county. (*People* v. *Trawick*, 78 Cal.App.2d 604 [178 P.2d 45]; 29 Cal.Jur.2d 658, et seq. §§ 1, 2 and 3.)

In *People* v. *Cluchey, supra* [1956] (Hearing denied by the Supreme Court) the court sustained a conviction for kidnaping for the purpose of robbery and for robbery. However, in that case defendant forced the victim at gun point to drive around for several blocks until a convenient place for robbing him was found. He was then ordered to stop and the robbery took place. It was held that the transportation or kidnaping was for the obvious purpose of robbery; that the kidnaping and robbery at the place were two separate and distinct offenses; and that the two offenses did not constitute double punishment for one offense. A hearing by the Supreme Court was denied July 24, 1956. It was also held that it is the fact, and not the distance, of forcible removal which constitutes kidnaping, citing *People* v. *Chessman, supra*.

From the evidence, viewed in its most favorable light in support of the jury's findings, it fairly appears that the original intent of the three men was to burglarize the club. This they did do. Defendant was properly convicted of the charge. In carrying out this offense they were interrupted by the presence of the night watchman or janitor, found sleeping in another room. At the point of a gun he was forced to tell them where the safe was located. In aid of the burglary and subsequent robbery he was tied and bound and subsequently released and made to travel about the club into and through the several rooms under force and fear. As to Parrocha and Paul and the charges here under consideration, they were not at or in the premises at that time. Their arrival was subsequent thereto and they were taken through the kitchen, hallway, and into the rest room by defendant by means of force and fear so defendant could subsequently rob one of them and assist the others in robbing the safe, as alleged. We conclude that this evidence would justify a finding that the complaining witnesses were being kidnaped within the meaning of section 207 of the Penal Code and for the purpose of robbery as defined in section 209 thereof. Apparently O'Farrell was the one who marched the complaining witnesses over this distance, tied and bound them and stood guard over them so that the three robbers could consummate the robberies described. The kidnaping appears to be an independent effort of defendant O'Farrell not only in aid of the original burglary but, by robbery, to obtain money from one victim and to aid the others in subsequently robbing the safe. We conclude from the authorities cited that the crimes of kidnaping for the purpose of robbery and the crime of robbery were independent crimes. Under proper instructions the jury so found and there is adequate support for its finding. (17 A.L.R.2d p. 1003 and cases cited.)

The pivotal question is whether the undisputed evidence shows that defendant is being punished for a single criminal act under section 654 of the Penal Code. In the Knowles case, *supra*, upon which defendant relies, defendants entered a clothing store and there found the owner and clerk. They displayed guns and compelled them to enter a stockroom in the rear of the store and face the wall. They took their wallets and one defendant then ordered the owner to go back to the cash register where he took the money, and returned the owner to the stockroom. After striking him on the head defendants left. The court held they were properly convicted of

violating section 209 of the Penal Code, kidnaping for the purpose of robbery, as it then existed, that the additional conviction of robbery should be reversed, and held that the convictions both rested upon the commission of a single act and that they could not be punished under more than one provision of the code for the same act. (See also *People* v. *Darcy*, 101 Cal.App.2d 665 [226 P.2d 53]; and *People* v. *Thwaits*, 101 Cal.App.2d 674 [226 P.2d 58].) The cases relied upon by defendant involved the offense of kidnaping for the purpose of robbery as defined by section 209 of the Penal Code prior to its amendment in 1951. At that time mere detention while committing robbery was sufficient to constitute the offense. Under those circumstances the robbery and the detention may well have been considered one act.

Lastly, defendant lumps several claimed errors of the court in relation to its rulings, comments, and refusal to give proffered instructions. Suffice it to say we have examined the entire record in relation to them and it does not appear that prejudicial error resulted. One involves a demonstration by the court in explaining the instruction given on circumstantial evidence, i.e., that if jam was found on a boy's face and fingers and he still indicated he had not been in the jam, that would be circumstantial evidence that he had. Another statement was that in respect to section 209 of the Penal Code, as read to the jury, "it is just as much kidnaping to ask a person to walk in front of you if he has a gun at your back and you do what he says, as it is if he would carry you." The instructions given sufficiently cover the proffered instructions refused. No prejudicial error appears.

Judgment and order denying a new trial affirmed.

Barnard, P. J., and Mussell, J., concurred.

A petition for a rehearing was denied June 17, 1958, and appellant's petition for a hearing by the Supreme Court was denied July 23, 1958. Carter, J., was of the opinion that the petition should be granted.